785 P.2d 163

Anthony G. **COOTZ,**
Petitioner–Appellant,

v.

**STATE of Idaho, Respondent.**

No. 18118.

Supreme Court of Idaho.

Dec. 21, 1989.

Anthony G. Cootz, Boise, pro se.

Jim Jones, Atty. Gen., Timothy D. Wilson, Deputy Atty. Gen., Boise, for respondent. Heard on the briefs.

JOHNSON, Justice.

This is a prisoner's rights case. In reaching our decision we must first determine whether the scope of the due process clause of our state constitution is the same as that of the due process clause of the federal constitution. We hold that our due process clause does not necessarily have the same scope as that of the federal constitution. In this case we conclude that the burden of proof established by the United States Supreme Court in prison discipline cases is the standard we establish under our due process clause. However, we hold that there were inadequate written findings of the evidence relied on in disciplining the prisoner. We also question the hearing officer's decision not to permit two witness-

es to testify at the disciplinary hearing. We reverse the decisions of the magistrate and the district judge that the prisoner's right to due process was not violated.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS.

In December 1983 Anthony Cootz, then a prisoner in the Southern Idaho Correctional Institution, was charged with violating prison rules by kicking a correctional officer in the chest. At the hearing, the only evidence presented against Cootz was the correctional officer's offense report. The correctional officer did not testify. Neither did Cootz. Cootz requested that four witnesses be called in his defense. Two of these, both inmates, testified. Two others, one an inmate and the other the sergeant in charge of the unit where the correctional officer worked, were not called by the hearing officer on the ground they were not available. Cootz contended that the sergeant would say that the correctional officer told him that he would lie about the purported assault. Cootz said he did not know what the third inmate would be able to say about the incident, because he had not had an opportunity to talk to the inmate.

Following the hearing the hearing officer found Cootz guilty of the violation. The hearing officer's written finding of the evidence he relied upon for the finding of guilt read: "The perponderance [sic] of the evidence put forth indicates you are indeed guilty of assaulting the officer." The hearing officer sanctioned Cootz with sixty days disciplinary detention.

Cootz filed a petition for writ of habeas corpus alleging that he was denied due process in the disciplinary hearing. Cootz listed among the grounds for his petition that (1) he had been denied the right to call witnesses who could have testified that he did not kick the officer and (2) no evidence had been presented at the disciplinary hearing to sustain a finding of guilt. In its return to the petition the state contended that Cootz had been permitted to have witnesses testify on his behalf and that it was within the prerogative of the hearing officer to determine whether the preponderance of the evidence considered at the hearing sustained the hearing officer's finding.

In the evidentiary hearing conducted by the magistrate the hearing officer testified that in reaching his decision at the hearing he considered (1) the correctional officer's offense report, (2) the testimony of the two inmates called at the request of Cootz, (3) the testimony of Cootz and (4) the fact that the sergeant who was in charge of the unit where the correctional officer worked would not have allowed the offense report to be written if he had not felt or believed that the report was true. The hearing officer also testified that he did not call the sergeant as a witness at the disciplinary hearing because he was not on duty at the time of the hearing. He said he did not call the other inmate as a witness at the disciplinary hearing because he had been transferred somewhere else.

The sergeant did testify at the evidentiary hearing before the magistrate. He said that he did not remember hearing the correctional officer say he would lie about the purported assault, but that his memory might have been better at the time of the disciplinary hearing. At the hearing before the magistrate Cootz said that the third inmate would have been able to testify as to other matters not directly related to the purported assault incident, but of matters that took place at the other end of the tier where the incident occurred.

The magistrate concluded that Cootz had not been denied his right to due process by the refusal of the hearing officer to call the sergeant and the third inmate as witnesses. The magistrate also concluded that there was evidence admitted at the disciplinary hearing upon which the hearing officer could have made a finding of guilt. The magistrate denied the petition for writ of habeas corpus.

Cootz appealed the magistrate's decision to the district judge. The district judge affirmed the decision of the magistrate. In doing so the district judge ruled that the hearing officer's decision would be upheld

if it were supported by some evidence. In doing so the district judge cited the decision of the United States Supreme Court in *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The district judge concluded that the correctional officer's offense report was sufficient evidence upon which to uphold the hearing officer's decision.

The district judge also noted that Cootz had raised for the first time on appeal the question of whether the hearing officer had made a written record of the evidence he relied on in reaching his decision as required by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The district judge concluded that the failure to argue or raise this issue before the magistrate constituted waiver.

Cootz appealed to this Court from the district judge's decision. We assigned the case to the Court of Appeals. In a per curiam opinion the Court of Appeals affirmed the district judge's decision. *Cootz v. State*, 117 Idaho 786, 792 P.2d 351 (Ct.App.1989). Cootz petitioned for review of the decision of the Court of Appeals. We granted review.

## II.

### IS THE SCOPE OF THE DUE PROCESS CLAUSE OF THE IDAHO CONSTITUTION THE SAME AS THAT OF THE UNITED STATES CONSTITUTION?

■ *Cootz* asserts that under the due process clause of our constitution (art. 1, § 13) the some evidence standard established by the United States Supreme Court in the *Hill* case should not apply. We agree that the scope of the Idaho due process clause is not necessarily the same as that of the federal constitution, but we conclude that in this case, the standard set by the Supreme Court in *Hill* is the appropriate one.

We note with interest that just 100 years ago when our state constitution was being formulated the question of the inclusion of a due process clause was considered.

When the proposed art. 1, § 13 was amended to insert the due process clause, the objection was made that the same language existed in the fourteenth amendment to the Constitution of the United States. Despite this objection, the section containing the due process clause was adopted. Proceedings and Debates of the Constitutional Convention of Idaho (1889) 287, 1595. While this does not establish by itself that the scope of our due process clause is different than that of the federal constitution, it does indicate that the drafters of our constitution believed that the federal due process clause did not make it unnecessary for our constitution to guarantee due process of law.

■ We also note that from time to time this Court has said in passing that our constitutional provision relating to due process of law is substantially the same as that of the United States Constitution. *E.g.*, *State v. Peterson*, 81 Idaho 233, 236, 340 P.2d 444, 446 (1959). However, we find no decision of this Court that has squarely addressed the question of whether the scope of our due process clause is the same as that of the fourteenth amendment. Today, we conclude that the scope is not necessarily the same. We are prepared to consider the parameters of due process under art. 1, § 13 of our constitution without being necessarily bound by the interpretation given to due process by the United States Supreme Court. *Cf. State v. Thompson*, 114 Idaho 746, 760 P.2d 1162 (1988) (Idaho's constitutional provision prohibiting unreasonable searches and seizures is subject to different interpretation than that given to the fourth amendment.).

We also note that from time to time this Court has decided due process questions with reference to our state constitution only, without considering the scope of the fourteenth amendment. *E.g.*, *State v. Evans*, 73 Idaho 50, 56, 245 P.2d 788, 791 (1952); *White v. Idaho Forest Indus.*, 98 Idaho 784, 786, 572 P.2d 887, 889 (1977); *Melody's Kitchen v. Harris*, 114 Idaho 327, 333, 757 P.2d 190, 196 (1988). These cases are evidence that this Court has not always found it necessary to resort to decisions of

the United States Supreme Court under the fourteenth amendment to decide what content we will give to our own due process clause.

Nevertheless, in this case we are persuaded that the "some evidence rule" formulated by the Supreme Court in *Hill* is the appropriate one for us to adopt in prison discipline cases. The rationale given by the Supreme Court for this rule seems sound in light of the complexity of the prison setting. In *Hill* the Court dealt with the revocation of good time credits. Here, we deal with disciplinary detention. We do not find any significant difference in the liberty that is impaired by one compared to the other. In *Hill* the Court said:

> The requirements of due process are flexible and depend on a balancing of the interests affected by the relevant government action. Where a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily. This interest, however, must be accommodated in the distinctive setting of a prison, where disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Consequently, in identifying the safeguards required by due process, the Court has recognized the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation.
>
> Requiring a modicum of evidence to support a decision to revoke good time credits will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.... Because the written statement mandated by *Wolff* requires a disciplinary board to explain the evidence relied upon, recognizing that due process

requires some evidentiary basis for a decision to revoke good time credits will not impose significant new burdens on proceedings within the prison. Nor does it imply that a disciplinary board's factual findings or decisions with respect to appropriate punishment are subject to second-guessing upon review.

472 U.S. at 454–55, 105 S.Ct. at 2773–74, 86 L.Ed.2d at 364–65 (citations omitted).

### III.

### DID THE HEARING OFFICER'S FINDING PROVIDE SOME EVIDENCE TO SUPPORT HIS DECISION?

■ The hearing officer's written finding did not indicate what evidence he relied on in disciplining Cootz. It referred merely to the "perponderance [sic] of the evidence put forth." The hearing officer testified in the hearing before the magistrate that he relied in part on the offense report in reaching his decision to discipline Cootz. Although the offense report might have been sufficient evidence to support the disciplinary decision, the hearing officer's failure to state in his written findings the evidence on which he relied violated one of the requirements of *Wolff*. There the Supreme Court held "that there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." 418 U.S. at 564, 94 S.Ct. at 2979, 41 L.Ed.2d at 956.

Here, it is clear that the requirement of a written finding of the evidence relied on is a salutary one, since the hearing officer later testified that he also relied on the fact that the sergeant who was in charge of the unit where the correctional officer worked would not have allowed the offense report to be filed if he did not believe it was correct. The reliance on this "evidence" is especially erroneous, since the procedures that applied to the disciplinary hearing specifically provided that "the Hearing Officer shall consider only evidence presented during the course of such hearing." We also find it curious that the hearing officer said he relied on the testimony of Cootz, since

42

Cootz did not testify in the disciplinary hearing.

While we are prepared to accept the "some evidence" standard established in Hill, we are not prepared to overlook the written finding requirement of Wolff in determining whether there is some evidence to support the hearing officer's decision. If we were to do so, we would open the door to post-hearing rationalizations whenever a prisoner challenged the sufficiency of the evidence stated in the written findings. It is not a heavy burden to place on our correctional officials to require them to state in their disciplinary decisions the evidence upon which they relied. Wolff requires it. So do we. We will look only to the written findings made at the time the discipline was ordered to determine if there was some evidence to support the decision. Here, the written findings do not indicate any evidence the hearing officer considered to support his decision.

We are unable to agree with the district judge that the issue of written findings was waived by Cootz because he did not present evidence or argue the point before the magistrate. One major thrust of the challenge Cootz has made throughout this proceeding is that there was not sufficient evidence to support the decision to discipline him. While his focus was generally on the inadequacy of the offense report to support the decision, he did preserve the question of the adequacy of the evidence. The written findings requirement of Wolff is inextricably interwoven with this question.

Because of the inadequacy of the findings of the hearing officer, we reverse the decision of the magistrate as affirmed by the district judge.

## IV.

### THE FAILURE TO CALL OTHER WITNESSES REQUESTED BY COOTZ.

■ While we have reversed based on the inadequacy of the findings of the hear-

ing officer, we also note our concern with the manner in which the hearing officer denied Cootz the opportunity to present his other two witnesses. The standard set in Wolff for allowing an inmate the opportunity to call witnesses is "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979, 41 L.Ed.2d at 956. Here, the findings of the magistrate indicate that the hearing officer did not call the sergeant because he was not on duty at the time of the hearing and that the hearing officer did not call the third inmate because he had been transferred "somewhere else." Neither of these reasons appear to fulfill the "unduly hazardous to institutional safety or correctional goals" standard.

### V.

### CONCLUSION.

We reverse the decision of the magistrate denying Cootz a writ of habeas corpus, as affirmed by the district judge, and remand the case to the magistrate for the granting of the writ and appropriate further proceedings.

BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, specially concurring.

The opinion authored by Justice Johnson has gained my concurrence because it is well-substantiated in holding that Cootz is at the least entitled to some due process. My only purpose in writing additionally is to observe that competent authority suggests that an inmate is entitled to more rights and a greater degree of dignity than seems to be the present norm.

Justice Johnson moves the Court in a doubtful direction when he writes that:

In Hill[1] the Court dealt with the revocation of good time credits. Here, we deal with disciplinary detention. *We do not find any significant difference in the*

1. Superintendent, Massachusetts Correctional Institution v. Hill, 472 U.S. 445, 105 S.Ct. 2768, 86

L.Ed.2d 356 (1985).

*liberty that is impaired by one compared to the other.*

117 Idaho at 41, 785 P.2d at 166 (emphasis added). The High Court in *Hill* had under review a disciplinary board's decision placing two inmates in isolation for fifteen days and revoking one hundred days of their good time credits. Justice O'Connor's opinion for the Court in *Hill,* as the majority does here, centers upon the revocation of good time credits, and does not discuss the liberty interests which are implicated by numerous days of isolated confinement.

At least one state has recognized the "some evidence" standard of *Hill,* but decided not to adopt it. Maryland for some time had applied the "substantial evidence" standard to a review of administrative decisions, and saw no reason to digress from that practice notwithstanding *Hill.* See *Greene v. Secretary of Public Safety,* 68 Md.App. 147, 510 A.2d 613, 619 (Md.App. 1986), citing with approval to *Bryant v. Department of Public Safety and Correctional Service,* 33 Md.App. 357, 365 A.2d 764 (1976) (penal institution's actions challenged by inmate grievance procedures will be upheld if supported by substantial evidence). Idaho, on the other hand, has neither legislatively nor judicially heretofore set any standard applicable to the review of inmate grievance proceedings or Department of Corrections procedures. Obviously there should be standards in place to govern the review of such administrative proceedings.

There may be, perhaps, good reason why the Idaho legislature has not adopted *one* standard of review that would apply to *all* administrative decisions. As Justice Stevens wrote in his dissent in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), it is realized that different standards of review and levels of scrutiny are appropriate. Otherwise put, it makes sense to be more concerned about a greater invasion of a citizen's liberty interests. In this case, it would appear that Cootz received a severe sanction. According to the Department of Corrections Policy and Procedure Manual, placement in the Disciplinary Unit for sixty days is the Class A–1 sanction, the top (and by implication the toughest) sanction listed on the Manual page entitled "Range of Allowable Sanctions." At the end of that page, Class D sanctions include such light sanctions as five days of extra duty, two hours each day, or formal warnings. As Justice Stevens explained in his dissent in *Meachum,* a portion of which is included at the end of this opinion, this Court should be more concerned about this relatively serious invasion of Cootz's liberty. The sanction he received was not in the form of formal warnings, but rather prolonged disciplinary detention.

A quick review of the Disciplinary Offense Report, the main piece of documentary evidence in this case, raises serious questions as to whether the evidence against Cootz supports the severe sanction he received. Cootz was charged with offense code O5–C, which is described in the Department of Corrections Policy and Procedures Manual as:

> Assault—any willful attempt or threat to inflict injury upon the person of another, when coupled with apparent present ability to do so, and any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm.

Clearly, an element of offense O5–C is the "present ability" of the offender to carry out the assault, or a "display of force" which strikes fear in the victim.

According to the Disciplinary Offense Report of the incident, filed by the prison guard who alleged the attack:

> I was on the tier putting inmates back in there cells from the exercise pens, *I had inmate cootz 15995 out of the pen with his hands cuffed behind his back.* as we passed cell # 6 inmate Garzee's cell, inmate cootz hesitated for a moment and grabbed for something laying on the food-tray shelfeof that cell. I asked to see what it was: and Mr. cootz refused, saying Fuck-it, I'll give it back, and he put it back on the shelf, as Mr. Garzee reached for it, I grabbed it to inspect it. At this time I seen a leg comming at me, but it was to quick for me to respond to

and it struck me in the chest, knocking the wind out of me. Had I not had my arms in front of me the way I did, I believe it could have been far more severe, as my arms obsorbed most of the shock. I then stEpped back out of his reach and went to the E–Door to advis

Idaho Department of Corrections—Disciplinary Offense Report, Log Number 12–83–M–73 (mistakes in the original; emphasis added).

The difficulties encountered with this report, which formed the main thrust of the evidence against Cootz, should be obvious. Cootz is handcuffed, with his hands behind his back. Yet, he is supposedly able to remove an object from within an inmate's cell as he is escorted past that cell. His guard-escort claims that Cootz kicked him in the chest, notwithstanding that his arms and hands were immobilized. The guard, who claims to have been kicked in the chest, does not fall backward but forward, with his hands out to stop his fall. Additionally, the status of Cootz as handcuffed is determined to not have affected his "present ability" to carry out the assault, or his ability to show a "display of force" which strikes fear in the victim.

Nevertheless, the "some evidence" rule is thought to be satisfied in this case, despite the glaring inconsistencies in the guard's report. Cootz received only the process guaranteed him by the "some evidence" rule. Should it be the rule that simply "some evidence" can justify prolonged severe disciplinary detention?

It should be remembered that those convicted of crime are made to pay their debt to society by removal from society, through confinement. On being convicted they are not sent to prison with directions that while incarcerated they are to have punishment inflicted upon them. Rather, such medieval days are far in the distant past. Justice Stevens, in his dissent in *Meachum*, explained, in simple yet forceful terms, why it is appropriate to distinguish, even for prisoners, between varying degrees of constraints on liberty:

The [United States Supreme] Court's rationale [in *Meachum*] is more disturbing than its narrow holding. If the Court had merely held that the transfer of a prisoner from one penal institution to another does not cause a sufficiently grievous loss to amount to a deprivation of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment [footnote omitted], I would disagree with the conclusion but not with the constitutional analysis. The Court's holding today, however, appears to rest on a conception of 'liberty' which I consider fundamentally incorrect.

The Court indicates that a 'liberty interest' may have either of two sources. According to the Court, a liberty interest may 'originate in the Constitution,' or it may have 'its roots in state law.' Apart from those two possible origins, the Court is unable to find that a person has a constitutionally protected interest in liberty. [Citations omitted.]

If a man were a creature of the state, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations.

A correct description of the source of the liberty protected by the Constitution does not, of course, decide this case. For, by hypothesis, we are dealing with persons who may be deprived of their liberty because they have been convicted of criminal conduct after a fair trial. We should therefore first ask whether the

deprivation of liberty which follows conviction is total or partial.

At one time the prevailing view was that deprivation was essentially total. The penitentiary inmate was considered 'the slave of the State.' See *Ruffin v. Commonwealth*, 62 Va. 790, 796 (1871). Although the wording of the Thirteenth Amendment provided some support for that point of view [footnote omitted], 'courts in recent years have moderated the harsh implications of the Thirteenth Amendment.'

The moderating trend culminated in this Court's landmark holding that notwithstanding the conditions of legal custody pursuant to a criminal conviction, a parolee has a measure of liberty that is entitled to constitutional protection[:]

"We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484.

Although the Court's opinion [in *Morrissey*] was narrowly written with careful emphasis on the permission given to the parolee to live outside the prison walls, the Court necessarily held that the individual possesses a residuum of constitutionally protected liberty while in legal custody pursuant to a valid conviction. For release on parole is merely conditional, and it does not interrupt the State's legal custody. I remain convinced that the Court of Appeals for the Seventh Circuit correctly analyzed the true significance of the *Morrissey* holding, when I wrote for that court in 1973:

"In view of the fact that physical confinement is merely one species of legal custody, we are persuaded that *Morrissey* actually portends a more basic conceptual holding: liberty protected by the due process clause may—indeed must to some extent—coexist with legal custody pursuant to conviction. The deprivation of liberty following an adjudication of guilt is partial, not total. A residuum of constitutionally protected rights remains.

"As we noted in *Morales v. Schmidt*, the view once held that an inmate is a mere slave is now totally rejected. The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual. [Footnote omitted.] 'Liberty' and 'custody' are not mutually exclusive concepts.

"If the *Morrissey* decision is not narrowly limited by the distinction between physical confinement and conditional liberty to live at large in society [footnote omitted], it requires that due process precede any substantial deprivation of the liberty of persons in custody. We believe a due regard for the interests of the individual inmate, as well as the interests of that substantial segment of our total society represented by inmates,[23] requires that *Morrissey* be so read." *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 712–713.

---

[23] "A substantial portion of our population is affected by the law in this area. Approximately 1.3 million people are at any one time subject to correctional authority; untold millions have criminal records. There is increasing doubt as to the propriety of treating this large group of persons as, in varying degrees, outcasts from society. And there is increasing recognition that such treatment is not in the ultimate interests of society. Denying offenders any chance to challenge arbitrary assertions of power by correctional officials, and barring them from legitimate opportunities such as employment, are inconsistent with the correctional goal of rehabilitation, which emphasizes the need to instill respect for and willingness to cooperate with society and to help the offender assume the role of a normal citizen." [President's Commission on Law Enforcement and Administra-

tion of Justice, Task Force Report: Corrections 82 (1967).]

It demeans the holding in *Morrissey*—more importantly it demeans the concept of liberty itself—to ascribe to that holding nothing more than a protection of an interest that the State has created through its own prison regulations. For if the inmate's protected liberty interests are no greater than the State chooses to allow, he is really little more than the slave described in the 19th century cases. I think it clear that even the inmate retains an unalienable interest in liberty—at the very minimum the right to be treated with dignity—which the Constitution may never ignore.

This basic premise is not inconsistent with recognition of the obvious fact that the State must have wide latitude in determining the conditions of confinement that will be imposed following conviction of crime. To supervise and control its prison population, the State must retain the power to change the conditions for individuals, or for groups of prisoners, quickly and without judicial review. In many respects the State's problems in governing its inmate population are comparable to those encountered in governing a military force. Prompt and unquestioning obedience by the individual, even to commands he does not understand, may be essential to the preservation of order and discipline. Nevertheless, within the limits imposed by the basic restraints governing the controlled population, each individual retains his dignity and, in time, acquires a status that is entitled to respect.

Imprisonment is intended to accomplish more than the temporary removal of the offender from society in order to prevent him from committing like offenses during the period of his incarceration. While custody denies the inmate the opportunity to offend, it also gives him an opportunity to improve himself and to acquire skills and habits that will help him to participate in an open society after his release. Within the prison community, if my basic hypothesis is correct, he has a protected right to pursue his limited rehabilitative goals, or at the minimum, to maintain whatever attributes of dignity are associated with his status in a tightly controlled society. It is unquestionably within the power of the State to change that status, abruptly and adversely; but if the change is sufficiently grievous, it may not be imposed arbitrarily. In such case due process must be afforded.

That does not mean, of course, that every adversity amounts to a deprivation within the meaning of the Fourteenth Amendment.[4]

[4] "This does not mean, however, that every decision by prison officials should be subject to judicial review or that the courts rather than experienced administrators should write prison regulations. *Morrissey* reminds us that due process is a flexible concept which takes account of the importance of the interests at stake; thus, it is abundantly clear that a myriad of problems of prison administration must remain beyond the scope of proper judicial concern. Only significant deprivations of liberty raise constitutional issues under *Morrissey*. Moreover, in determining whether to require due process, we need not choose between the 'full panoply' of rights afforded a defendant in a criminal prosecution, on the one hand, and no safeguards whatsoever, on the other. Rather, as *Morrissey* aptly illustrates, the requirements of due process may be shaped to fit the needs of a particular situation." *United States ex rel. Miller v. Twomey,* 479 F.2d, at 713.

There must be grievous loss, and that term itself is somewhat flexible. I would certainly not consider every transfer within a prison system, even to more onerous conditions of confinement, such a loss. On the other hand, I am unable to identify a principled basis for differentiating between a transfer from the general prison population to solitary confinement and a transfer involving equally disparate conditions between one physical facility and another.

*Meachum v. Fano,* 427 U.S. 215, 229–235, 96 S.Ct. 2532, 2540–2543, 49 L.Ed.2d 451 (1976) (Stevens, J., dissenting) (emphasis added).

Perhaps that which Justice Stevens wrote in *Meachum* may be one day discovered as the sowing of the seeds of enlightenment.

BAKES, Chief Justice, concurring in part and dissenting in part:

Regarding Part II, the Court's opinion concludes that "in this case we are persuaded that the 'some evidence rule' formulated by the Supreme Court in [*Superintendent, Mass. Corr. Institution v.*] *Hill* is the appropriate one for us to adopt in prison discipline cases." Since we are following the standards set down by the United States Supreme Court in *Hill*, it is unnecessary *dicta* to "conclude that the scope [of the due process clause of Art. 1, § 13 of the Idaho Constitution] is not necessarily the same" as the due process clause of the fifth amendment of the United States Constitution. As the Court's opinion points out, we have previously held otherwise. *State v. Peterson*, 81 Idaho 233, 236, 340 P.2d 444, 446 (1959). We have also held that the search and seizure clause of the Idaho Constitution is to be interpreted similarly to the search and seizure clause of the fourth amendment. *State v. Cowen*, 104 Idaho 649, 662 P.2d 230 (1983); *State v. Oropeza*, 97 Idaho 387, 545 P.2d 475 (1976).

If we are going to reconsider our prior decision in *State v. Peterson*, 81 Idaho 233, 340 P.2d 444 (1959), which held that the due process clause of the Idaho Constitution is not substantially different from the due process clause of the United States Constitution, we should wait until we have a case before us where there might arguably be a difference and have the issue briefed and argued. As the Court's opinion recognizes, this is not an appropriate case for such a claim to be considered.

I concur as to Part III of the Court's opinion which holds that the decision of the United States Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), requires this matter to be remanded for new findings concerning the evidence which the hearing officer considered to support his decision.

With regard to Part IV of the Court's opinion, I am concerned about the vagueness of the Court's rejection of the reasons for failure to call the third inmate because he had been transferred "somewhere else." There have to be reasonable limits on the requirement of the State to move prisoners around at these kinds of administrative disciplinary hearings. Unfortunately the record in this case does not spell out the location of the prisoner witness or any difficulties involved in trying to obtain his attendance. Accordingly, we have no record to evaluate the State's failure to produce that prisoner witness at the hearing. Since this matter must be remanded, that can be more clearly set out in the record. However, in my view, if a prisoner witness is not reasonably available in the same compound, then in the absence of some showing that the witness was transferred out for the purpose of preventing his testifying, I believe it would be unreasonable to require the State to incur the hazard or the expense of having to move prisoner witnesses from site to site. In any event, there should be some clear showing that the witness was critical to the inmate's case before a due process violation showing has been made.