**Herbert O. JENSEN, Plaintiff,**

v.

**Alton LICK, Winston Satran, Charlene Seifert, Cordell Stromme, Dennis Jacobs, Roy Nagel, Larry Parkos, Marvin Ximmer, Doris Mattson, Defendants.**

**Civ. No. A1–83–113.**

United States District Court,
D. North Dakota,
Southwestern Division.

Jan. 9, 1984.

Herbert O. Jensen, pro se.

Robert O. Wefald, Atty. Gen., State of N.D., Bismarck, N.D., for defendants.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This is the third order on the fourteenth proceeding this petitioner has brought on his own behalf since his conviction on February 19, 1976, and the imposition of two concurrent sentences of twenty years for second degree murder and ten years as a dangerous offender. (N.D.Crim.Nos. 613 and 614.)

In this action, brought under 42 U.S.C. § 1983, plaintiff complains that the Warden of the North Dakota State Penitentiary has instituted an unlawful urine screening program for the detection of the presence of marijuana in urine samples taken from the inmates. The program is outlined as follows:

1. Inmates are selected at random, except where an inmate is suspected of drug usage, he may be screened more frequently.

2. The inmate is notified the night prior to the taking of the sample, and the notice has the status of an order.

3. Refusal to give a sample, or a positive test result, is a serious offense affecting the good time benefits allowed the inmate under N.D.C.C. Chapter 12–54.1.

4. Urine samples are tested at the North Dakota State Laboratory.

5. A sample which shows a positive level of over 20 nanograms per milliliter of urine results in the filing of an incident report, and reference over for disciplinary action.

6. The penalty for the infraction is the loss of 20 to 40 days earned good time as a first offense, and an additional period of disciplinary segregation if it is a second offense.

7. Like periods are imposed for failure to give a sample.

The plaintiff complains that the urinalysis test used has the trade name "Emit" and is produced by the Syva Company of Palo Alto, California and is inaccurate in that a small percentage of false-positive tests may occur. The penitentiary officials use no alternative testing program as a check.

The defendants admit to using no alternative program but deny that the "Emit" test is inaccurate, and assert that in any event, repeated testing of urine which has produced positive results, negates any possibility of error.

Plaintiff has moved for an order compelling discovery (Docket No. 15) and for default judgment for failure to answer interrogatories (Docket No. 27). Both of these motions are denied, and in fact were disposed of in the order dated November 17, 1983 (Docket No. 35).

Plaintiff has also moved repeatedly for leave to file supplemental briefs to raise issues. The court grants those motions as a matter of course as to those supplemental briefs which have been filed up to but not after December 12, 1983.

Defendants have moved for dismissal under Rule 12, Fed.R.Civ.P., or in the alternative for summary judgment of dismissal under Rule 56(c), Fed.R.Civ.P.

Plaintiff asserts in his complaint that he received a written order to furnish a urine sample and failed to do so. So the plaintiff, in fact, has never received an inaccurate "Emit" test result. The punishment meeted out to him was for a failure to obey an order. And that decision was reversed

by an in-house administrative review for a failure of the prison officials to follow the penitentiary's standards of fairness, including notice.

Our first problem is, must this action be dismissed under Rule 12, Fed.R. Civ.P., for a failure to state a claim upon which relief can be granted, i.e., has plaintiff declared an injury which gives him standing to sue? He has not been injured by an inaccurate "Emit' test result. He has simply refused to take the test and the punishment for disobeying an order has been reversed due to defendants' failure to follow the appropriate administrative procedures. However he is still subject to the requirement that he comply with the testing program. The question of when a litigant has "standing" must be determined "individualistically, with an eye both to the specific circumstances of particular cases and to the court's eagerness to reach the issues tendered for decision." 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531 at 184 (1975).

In this instance we may concentrate on the first element. While the plaintiff devotes his facts and arguments to the issue of the reliability of the "Emit" testing process, he must, on a day by day basis, obey the rules of selection for testing, unless the entire procedure is thrown out. So this litigant has a concern which impacts pragmatically on him, to determine the lawfulness of the testing requirement. His claim does meet the fundamental demand of adversary litigation, i.e., the case presents to the plaintiff "the prospect of immediate tangible benefit to the litigant." *Id.* at 224. Moreover, the nexus requirement described in the Supreme Court's *Valley Forge Christian College* decision [1] is also met because of the threatened injury to the plaintiff. By a random selection, the plaintiff could be selected at any time to take the test. The plaintiff may also be asked to take the test based on any guard's suspicion that the plaintiff is using drugs. Finally, if the plaintiff receives a favorable decision, he will no longer be subject to either taking the test or being punished for refusing to take it.

I conclude the plaintiff does have standing.

The urinalysis program which the plaintiff resists is as follows:

### Urinalysis Program

All inmates incarcerated at the N.D. State Penitentiary and State Farm will be required to submit to a urine testing program. The purpose of this program is to help provide a secure, humane, safe, and clean environment for all inmates and staff. No inmate is allowed to use any type of drug that was not prescribed by the medical staff of the institution.

1. Inmates are selected on a random basis.

2. Inmates are tested at irregular intervals.

3. Inmates who are suspected of drug usage may be screened more frequently.

4. Urine sample are produced under direct observation by an officer.

5. Before an inmate is moved to the Honor Dorm, he will be required to submit to a urine test.

6. Refusals are handled as positive findings. Positive analysis results in an inmate being referred to the Adjustment Committee. [sic]

7. Urine samples will be tested at the North Dakota State Laboratory.

1. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).

Inmates selected to submit a urine sample will be notified the night prior to the sample being taken. In the event an inmate refuses to submit the urine sample, an incident report will be written for "Refusing to Obey an Order". [sic] The action taken will be the same as if the test was found to be positive which is loss of four months' [sic] good time. If it is the second offense, the Adjustment Committee's recommendation will be loss of four months' [sic] good time and a period of time in Disciplinary Segregation.

Anyone refusing to submit to a urine sample or found with a positive test is considered to have committed a serious offense under the good time provisions of Chapter 12–54.1 of the North Dakota Century Code.

Warning notices will be forwarded to inmates with test results under the 20 nl/mg.

*North Dakota State Penitentiary and State Farm Inmate Handbook* at 56–57.

N.D.C.C. § 12–54.1–02 provides for forfeiture of earned good time for violations of the rules. *See Matz v. Satran,* 313 N.W.2d 740 (1981).

Turning now to the Rule 56 motion, the defendants assert that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material facts, and that the defendants are entitled to a judgment of dismissal as a matter of law since neither of the constitutional standards of the 14th amendment (due process) or 8th Amendment (cruel and unusual punishment) are violated.

Before turning to the facts of the testing program, we must have in mind some general principles relating to the rights of prisoners.

■ A prisoner is not stripped of all his constitutional protections upon his imprisonment. *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

But the very nature of lawful incarceration "brings about the necessary withdrawal or limitation of many privileges and rights." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), *quoting, Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

And "[b]ecause the realities of running a penal institution are complex and difficult," wide-ranging deference must be accorded the decisions of prison administrators. *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). And, finally, the plaintiff has already tested, and found adequate, the disciplinary procedures used by the State Penitentiary. *Jensen v. Satran,* 688 F.2d 76 (8th Cir.1982).

The problem these prison officials are faced with is the control of contraband in, and use of, emotion and conduct affecting drugs, without adequate professional supervision, in a close, compelled, artificial society. The need for such control is self evident. Any reasonable attempt to exercise control must be treated with deference.

■ Turning now to the "Emit" test. The Center for Disease Control in Atlanta, Georgia, undertook to test the reliability of "Emit" testing procedures and found them to be 97 to 99% accurate. The manufacturers of the testing equipment, relying in part on that data, claim that *testors can act with a 95% confidence in the accuracy of the test result.* This figure takes into consideration the factors of a low reading as contrasted with a high reading, plus such factors as improper performance of the test. As used, the 95% statistical figure, in the field of science and medicine, is recognized to mean *almost complete certainty.* Plaintiff's Supplemental Brief at 5a (Docket No. 35).

A charge premised on a positive test is heard and resolved under the rules of the penitentiary for discipline proceedings. These rules provide that

   a) the chairman calls any witnesses available to address the charge, and

b) the inmate is represented by a staff representative responsible for presenting any exonerating or mitigating evidence on the inmate's behalf.

So, as would be normal in these cases, the "Emit" test results could be bolstered by confirmation tests, where that was necessary, or by discovery of marijuana residue, paraphernalia, roaches, and roach clips. By the same token the inmate claiming the test is false can as part of his defense contest the specific result through his representative by requiring a confirmatory test, or pointing out the absence of other evidence of use, so forth.

Defendants have suggested that the proper standard of proof is "more likely so than not so" rather than "beyond a reasonable doubt," citing *United States v. Strada*, 503 F.2d 1081 (8th Cir.1974). Since the material furnished by the plaintiff establishes that the test can be relied upon with 95% confidence in the accuracy of the test result; and since that is tantamount to *almost complete certainty*, I conclude that such a level of reliability is adequate to support a decision for administrative punishment in the prison circumstance, whichever standard of proof is used.

Other issues have been raised but the plaintiff has concentrated his entire presentation on the issue of claimed unreliability of the "Emit" test.

I conclude from a careful review of all of the material in the file, including but not limited to the appendices to plaintiff's supplemental brief (Docket No. 35), that defendants are entitled to a judgment of dismissal as a matter of law for the reason that there is no genuine issue as to any material fact.

Defendants have moved for attorneys fees under 42 U.S.C. § 1988. This statute allows to the prevailing party a reasonable attorneys fee. Since the Chapter of Civil Rights is addressed to assuring a forum to persons who would not normally feel they could risk the costs of litigation, the courts have supported the spirit of the statute by requiring that attorneys fees to a defendant shall be allowed only if the action is frivolous or malicious. *Bowers v. Kraft Foods Corp.*, 606 F.2d 816 (8th Cir.1979).

This court after reviewing the evidence concludes that the action was not frivolous or malicious. Therefore the motion for attorneys fees is DENIED.

Let judgment be entered accordingly.