809 P.2d 472

**David M. BOURGEOIS,**
**Appellant–Respondent**
**on Appeal,**

v.

**A.I. MURPHY, Director, and Jim Evans, Warden, Elton J. Mendenhall, Departmental Hearing Officer of the Idaho Correctional Institution at Orofino, Idaho, Respondents–Appellants on Appeal.**

No. 17757.

Supreme Court of Idaho,
Boise.

Feb. 28, 1991.

Rehearing Denied May 6, 1991.

Jim Jones, Atty. Gen., and Timothy D. Wilson and Robert R. Gates, Legal Services Div., Boise, for respondents-appellants on appeal.

David M. Bourgeois, Boise, pro se.

BISTLINE, Justice.

### I. BACKGROUND

The office of the Attorney General on behalf of the above-named respondents has

appealed from the appellate decision of the district court of the Second Judicial District of the state of Idaho, Clearwater County, which appellate decision was as follows:

This matter is on appeal from the Magistrate Court which held that the EMIT-st test was a sufficient basis for a disciplinary action in the penitentiary and that the procedures for the chain of custody for handling urine samples is legally adequate. We reverse in part.

Appellant produced evidence that there is a 95% confidence in the accuracy of the EMIT-st urine test. While a 95% accuracy in some samples may be sufficient, here it is not. Of every 100 samples tested for marijuana, there is the possibility that five will erroneously test positive. That means that five of 100 prisoners who are not given a second test may receive disciplinary actions which will effect their parole eligibility or other privileges. Therefore, we hold that when a urine sample tests positive, a second confirming test is required. Disciplinary action, suspension, or denial of privilege may [otherwise] well result based upon an inaccurate test result. The violation and any reference to disciplinary action that resulted from the single EMIT-st test shall be stricken from Appellant's record.

Appellant also alleges the chain of custody is legally inadequate. A review of the record indicates the State has established legally adequate procedures. Appellant has produced no evidence to support the allegation that the test results were *sequel* because of an improper chain of custody.

R. 74–75 (emphasis added).[1]

The State contends that the district court erred in holding that a *single* positive result to an EMIT-st urinalysis test does not constitute sufficient evidence to uphold the petitioner's in-house conviction, by departmental hearing officer Elton J. Mendenhall, of being under the influence of intoxicants (use of cannabinoids [marijuana]).

The State's opening brief serves to advise with reasonable accuracy the genesis of the controversy giving rise to the single issue:

Bourgeois is an inmate in the custody of the Idaho State Board of Correction. At the time of the filing of this action he was being housed at the Idaho Correctional Institute–Orofino (ICI–O).

On or about September 2, 1987, Bourgeois and 9–11 other inmates were taken to the bathroom, strip searched, and ordered to give urine samples. When Bourgeois had [complied with] ... providing the urine sample, he handed the cup to Correctional Officer May, who took his name and institutional number, noted it on the cup and set it on a ledge behind him.

The urine samples collected were then taken to the alcohol treatment unit at State Hospital North for testing.

Bourgeois' urine sample was tested by use of the EMIT-st drug detection system. Defendants' Exhibit 4. The EMIT test is an enzyme immunoassay drug detection system.... designed to detect the presence, but not the quantity, of various kinds of drugs in the human body.

A result card showing a positive result for the presence of cannabinoids in Bourgeois' system was returned to the ICI–O. Defendants' Exhibit 4. Bourgeois was issued a disciplinary offense report (DOR) ... charging him with being under the influence of marijuana. Defendants' Exhibit 1.

[Following] a disciplinary hearing ... conducted by ... Mendenhall ... Bourgeois was found guilty based upon the positive result of the EMIT test and was sanctioned with thirty (30) days in disciplinary detention.... Defendants' Exhibit 1.

The disciplinary offense report was reviewed and affirmed by Respondent/Appellant Evans on September 11, 1987. State's Brief, 1–3 (citations to record omitted). This was followed by Bourgeois' ap-

---

1. We work with the record which is made up below, submitted to the parties, and presumably approved. Neither party has suggested to us, by way of motion to augment or otherwise, what the word "sequel" means or what word was likely intended.

peal to the district court. The district court reversed the magistrate court, solely on one point and one basis. The district court held:

> When a urine sample tests positive, a second confirming test is required. Disciplinary action, suspension, or denial of privilege may well result based upon an inaccurate test result.

R. 75. To the State's presentation of the facts, Bourgeois added the following:

> [At the disciplinary hearing proceeding] present were DHO Mendenhall, Respondent and a legal assistant requested by Respondent.
>
> At the conclusion of the aforementioned hearing, DHO Mendenhall found Respondent guilty of the offense charged and sentenced Respondent to thirty (30) days in the detention unit at the Idaho Correctional Institution at Orofino. The facts that DHO Mendenhall relied on for the finding of guilt were, the evidence contained in the body of the report and the attached EMIT ST Result Card.

Respondent's Brief, 3. Bourgeois, in his brief filed in this Court, contends:

> That a single positive result of an EMIT urinalysis test does not constitute sufficient evidence to uphold a prison disciplinary finding of guilt.
>
> The district court erred in holding that the state has established legally adequate procedures as well as a proper chain of custody.

Respondent's Brief, 4.

The magistrate provided the parties with no explanation for the summary denial. To the contrary, the well-prepared petition of Bourgeois thoroughly stated the grounds upon which an alternative writ should have issued—Bourgeois had been found guilty at a prison disciplinary hearing which left much to be desired. The authorities denied him one witness for certain, and probably two; one witness was staff personnel and would have had to be paid overtime inasmuch as the hearing was scheduled to take place during his nonworking hours. The other witness is referred to in the record as "her," and apparently was second in command at the department facility. The punishment imposed was loss of liberty, *i.e.*, sentenced to thirty days in detention, and also, so far as is known presently, the loss of his good time credits. Bourgeois' petition for issuance of the writ also laid before the magistrate court the contention that the prison's methodology in establishing his guilt was in violation of the federal constitution's guarantee of due process:

> Respondent Mendenhall used a single Emit test result to base his finding that Petitioner was guilty of the offense with which he was charged. Respondents failed to have an additional test performed to prove the conclusiveness of the first test. Emit tests when admitted as a single exhibit have been held to be inconclusive as evidence in both court and prison disciplinary hearings.
>
> Respondents failed to establish the chain of custody of the urine sample in question. Petitioner had no idea of the manner in which the sample was handled, nor the conditions in which the test was performed.

R. 4.

Rather than being content to stand on mere assertions, Bourgeois buttressed his statements and contentions with citations to authority which on examination should have at the least drawn some comment. Bourgeois argued for the applicability of then very recent authority which, in an area of law having had but a very short history, seemingly was entitled to some consideration. In particular, Bourgeois cited *Wykoff v. Resig*,[2] 613 F.Supp. 1504 (N.D.Ind.1985), authored by Judge Allen Sharp. That opinion was believed to be of enough importance relative to the law of prison disciplinary proceedings that it was published, which reasonably should have caused the magistrate to at least give some pause. Bourgeois did not merely mention *Wykoff* in passing, but quoted from it directly in his petition, setting out the judge's recounting of the testimony of the plaintiff's expert:

---

**2.** When the attorney general later became involved, its briefing also cited *Wykoff*.

The EMIT test is a way to screen urine samples quickly and efficiently; that it was never meant to be final; and that it is a way to get rid of the negatives. The manufacturers of the EMIT system, Syva Corporation, recommends that all positive EMIT results be confirmed where a greater degree of certainty is required. The Federal Bureau of Prisons also requires that positive urine samples 'be validated to substantiate the positive result.' *Id.* 613 F.Supp. at 1509. R. 5; *See Wykoff,* 613 F.Supp. at 1508–09. Bourgeois' case involves the same exact EMIT test as was involved in *Wykoff,* differing only in that the setting is in Idaho rather than in Indiana. Bourgeois conceded in his petition *Wykoff's* holding that: "EMIT results could be used as evidence of guilt in a disciplinary hearing *when the chain of custody passes* constitutional scrutiny and *the test results are confirmed by an alternative method of testing."* R. 5; *see Wykoff,* 613 F.Supp. at 1512 (emphasis added).

In addition to *Wykoff,* Bourgeois provided citations to other relevant opinions which included the following: *Kane v. Fair,* 33 Cr.L. 2492 (Mass.Dist.Ct.1983); *Johnson v. Walton,* No. 12348, Rutland Superior Court, (Vt.Super.Ct.1985); *Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y. 1984); *Peranzo v. Coughlin,* 608 F.Supp. 1504 (S.D.N.Y.1985); *Denike v. Fauver,* No. 83–2737 (D.N.J.1983); *Higgs v. Wilson,* 616 F.Supp. 226 (D.Ky.1985); *Tupis v. State of Idaho,* No. HC 2807 (Fourth District, Ada County, March 8, 1988).

The district court on making an appellate review of the magistrate's first decision reversed it, which did serve to signal the magistrate on remand to reconsider, following which he apparently recognized that there might be merit to the Bourgeois' petition replete with citations of authority. An order was issued directing the respondents to show cause, with supporting documentation, why the writ of habeas corpus should not issue. On March 7, 1988, the writ, directed to the respondents, was issued. Thereafter a one day trial was had, but only after the State had filed the response which is statutorily required, and which the district court directed. The response was exceedingly sparse and mostly conclusory.

When the district court ordered that the writ issue, the prosecutor apparently sought and obtained the services of the Idaho Attorney General. The Attorney General's office submitted a response to the district court, consisting of two parts. In the statement of facts the State laid out very nicely the procedure which is supposed to be followed, but offered no contradiction to the statements in the brief of Bourgeois as to what actually took place.

In the argument part of the brief, the State cited *Wolff v. McDonnell,* 418 U.S. 539 (1974), for the proposition that "in prison law the same safeguards which apply in a criminal proceeding have no place in a prison disciplinary proceeding." R. 22–23. The State cited *Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), for the proposition that "due process only requires that there be some evidence, or any evidence at all, in the record to sustain the finding of guilt." R. 23.[3] The State added thereto its own assertion: *"Regardless* of the indicia of reliability, which for the EMIT test is higher than 95%, a positive result on a drug screening test does constitute some evidence to support a finding of guilt. The Washington Supreme Court is in accord." R. 23. The Washington Supreme Court did state in *Petition of Johnston,* 109 Wash.2d 493, 745 P.2d 864 (1987), just as the State here says that it did, that "a single positive result of an EMIT urinalysis test is sufficient by itself to support disciplinary sanctions against an inmate for violating a prison rule against illegal drug use." R. 23, *See Johnston,* 745 P.2d at 868 ("We hold that a single positive result to an EMIT urinalysis test provides some evidence of marijuana use and uphold the sanctions imposed on the 10 petitioners.").

---

**3.** The State acknowledged that the district court was aware of *Walpole,* the district court having cited that case in its decision reversing the magistrate.

Relative to the chain of custody issue, the State's brief was rather noncommittal: "It is not up to the prison officials to state Petitioner's claims for him. Petitioner must show at the disciplinary hearing, by evidence offered by himself, that there was some problem with the chain of custody of the urine samples given." The State added to the foregoing only that: "The hearing officer in this case was in possession of the knowledge of the standard operating procedures for collecting and testing urine samples in use at the institution." R., 23–24. Apparently the State believed that it was enough to *"know the procedures"* but of no consequence *whether the prescribed procedures were followed,* which in most instances would be a matter wholly under the direction and control of the institution, certainly not under the direction and control of inmates who can only become knowledgeable by what they observe actually taking place. At the conclusion of the response, the State requested the district court to enter an order dismissing the petition for issuance of the writ of habeas corpus. That request did not receive a ruling. The magistrate, on reconsideration and further examination of Bourgeois' authority saw grounds for issuance of the writ, obtaining a response, and conducting a trial.

Before proceeding into happenings at trial, and the trial court's application of the law to the facts which were found, it is helpful to first take note of the applicable law which has been furnished to us by the State and by Bourgeois. *Wykoff,* 613 F.Supp. 1504, has been earlier cited and quoted from; other case law precedent will be examined to the extent necessary. All concern EMIT testing and its reliability when applied under the some evidence rule. The two federal cases both from the Southern District of New York provide a good starting point. In the first of the two in time, *Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y.1984), Judge Haight presiding, provides ten pages of illumination, portions of which are pertinent to the circumstances of this case. Bourgeois' brief filed in this Court relies upon *Storms* for the proposition that a "Substantial question was as to whether EMIT tests are reliable without a second [confirming] test." Respondent's Brief at 7. Judge Haight had at hand two cases with divergent results, one from the District of North Dakota, *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D.1984), which Judge Haight seemingly viewed with a jaundiced eye. He noted that the United States District Court in that case:

> [O]bserved that '[t]he Center for Disease Control in Atlanta, Georgia, undertook to test the reliability of "Emit" testing procedures and found them to be 97 to 99% accurate,' *data upon which the manufacturer relied in claiming that 'testers can act with a 95% confidence in the accuracy of the test result.'* 589 F.Supp. at 38. 'As used,' the district court continued, 'the 95% statistical figure, in the field of science and medicine, is recognized to mean *almost complete certainty.'* *Ibid.* (emphasis in original).

*Storms,* 600 F.Supp. at 1221 (emphasis supplied and in original).

Obviously there may be some case law in North Dakota which entitles the claims of a manufacturer touting his product to a presumption of some sort, perhaps even irrebuttable. Judge Haight was not wrong in expressing *some* skepticism:[4] "The opinion does not particularize the reliability testing procedures followed by the Center for Disease Control." 600 F.Supp. at 1221. Judge Haight then examined another reported case pertinent to his inquiry:

> On the other hand, in *Kane v. Fair,* Civ. No. 136229 (Super.Ct.Mass., decided August 5, 1983), a Massachusetts trial court considered the EMIT process *in the light of the medical evidence* before it and concluded:
>
> > No evidence having been introduced that warrants my finding that EMIT has been generally accepted by toxicologists and/or pharmacologists as producing a reliable positive result in the

---

**4.** Six months after Judge Haight's opinion, Judge Sharp in his *Wykoff* opinion noted that at his writing the only federal case which had ruled on the merits to allow use of a single unconfirmed EMIT test result was *Jensen v. Lick,* the North Dakota decision.

absence of independent *confirmation,* I find that it does not produce such a result absent such confirmation.

Slip op. at 4. [Emphasis in original.] The court in *Kane* preliminarily enjoined introduction of a positive EMIT test in a prison disciplinary hearing 'unless accompanied by evidence that the positive result was confirmed by an alternative method of analysis.' *Id.* at 9.

It is interesting to note that while the federal Bureau of Prisons has promulgated regulations requiring, *inter alia,* that 'staff shall randomly sample each institution's inmate population during each month to test for drug use,' they also require that 'staff shall have each positive urine test validated to substantiate the positive result.' 28 C.F.R. § 550.30(a), (b). The regulations do not specify what initial tests or validating procedures are to be utilized.

The present plaintiffs submit an affidavit of Leo Gross, Ph.D., verified December 12, 1983. Dr. Gross holds his doctorate in biophysics, and is research director of the Waldemar Medical Research Foundation. His affidavit quotes a printed statement issued by the manufacturer of the EMIT process:

> Because there are many variables that affect ordinary drug levels, an EMIT-st test result *is useful only as an indication.... Results should be confirmed by ... an alternative equally sensitive analytical method* when loss of rights or other corrective action is contemplated.

Gross affidavit at ¶ 4.

Dr. Gross also discusses the phenomenon of 'false positives,' ¶¶ 5–7. Their falsity may apparently be detected by alternative testing methods, such as chromatography and mass spectrography. ¶ 8. It appears from other material submitted by plaintiffs that the use of common, nonprescription cold medications may skew the EMIT test results for drugs. Memorandum of Ann Burton, July 1984.

While I do not regard the present plaintiffs' showing as strong enough to justify the issuance of a preliminary in-junction, this record and these authorities raise an issue of substance as to the test's reliability. The complaint certainly survives a motion to dismiss. I regard the case as appropriate for assignment of counsel from the Court's civil *pro bono* panel.

*Storms,* 600 F.Supp. at 1221–22 (emphasis added).

The second of the two federal cases from the Southern District of New York cited to by Bourgeois is *Peranzo v. Coughlin,* 675 F.Supp. 102 (S.D.N.Y.1987). Judge Leonard Sand held in *Peranzo:*

> · [W]ith a 98 + % rate of accuracy, the *double EMIT testing* as performed by the DOCS is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process.

675 F.Supp. at 105 (emphasis added). Judge Sand relied on an Eighth Circuit case in finding that the use of *two* EMIT tests provided sufficiently reliable evidence in the light of due process concerns:

> In a recent decision under the *Superintendent v. Hill* standard, the Eighth Circuit has held that 'the EMIT test, as used at Iowa State Penitentiary *with a confirmatory second test,* contains sufficient indicia of reliability to provide some evidence of drug use.' *Spence v. Farrier,* 807 F.2d 753, 756 (8th Cir.1986).

*Peranzo,* 675 F.Supp. at 105 (emphasis added).

Bourgeois cited *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky.1985), to further support his contention that his due process rights were violated by the use of a single, unconfirmed EMIT test as evidence in a disciplinary hearing. *Higgs* held that the inmate plaintiffs were entitled to a preliminary injunction enjoining corrections officials from taking any disciplinary action against inmates based solely on the unconfirmed results of EMIT urinalysis tests. In arriving at this result the court stated:

> [I]nmates are not stripped of all of their constitutional rights. They retain the right to minimum fundamental fairness and diminished due process rights. *Wolff v. McDonnell,* 418 U.S. 539, 94

S.Ct. 2963, 41 L.Ed.2d 935 (1974). A part of the due process guarantee is that an individual not suffer punitive action as a result of an inaccurate scientific procedure. *See United States v. Brown*, 557 F.2d 541 (6th Cir.1977).

*Higgs*, 616 F.Supp. at 230. The court found that the EMIT test, standing alone, was not sufficiently reliable to show the presence of drugs where an inmate's liberty was at stake, noting that, "even the manufacturer of the test recommends that positive tests be confirmed by an alternate method of analysis." 616 F.Supp. at 231.

In support of its conclusion the *Higgs* decision discussed two cases, one out of Vermont and the other out of Massachusetts, which were, quite appropriately, also discussed by Bourgeois in his petition. The *Higgs* court wrote:

At least two courts have held that the *chance of false positives in unconfirmed EMIT test results and the concomitant loss of liberty violates minimum fundamental fairness and the prisoners' due process rights. Johnson v. Walton*, unpublished opinion, Docket No. 561–84 Rm (Rutland Superior Court Vermont Feb. 14, 1985); *Kane v. Fair*, 33 Cr.L. 2492 (Mass.Superior Court, August 5, 1983). In *Johnson*, the Vermont court found that the authorities presented to it agreed that the EMIT test was not scientifically reliable when used alone, and that another test, mass-spectroscopy, was recognized by all authorities as 100% reliable. The court noted that it did not understand why the Commissioner of Corrections did not use mass-spectroscopy to confirm all positive tests because although that procedure was more expensive, methods should have been available for the inmates to reimburse Corrections. It did not, however, require the defendants to make mass-spectroscopy available. Instead, it found that when EMIT is confirmed by thin-layer chromatography, a positive result indicates presence of the drug with scientific certainty beyond a reasonable doubt. Thus, it required confirmation by either mass spectroscopy or thin-layer chromatography.

The Massachusetts court in *Kane v. Fair, supra,* made similar findings. It concluded that *the state failed to show 'that knowledgeable scientists would accept an unsubstantiated EMIT-positive result as evidence of drug use.'* Therefore, considering the punitive measures that flowed from a positive test and the adverse impact such a test could have on an inmate's chance for parole, the court held that *'[n]o positive EMIT test result may be introduced as evidence in any disciplinary hearing unless accompanied by evidence that the positive result was confirmed by an alternative method of analysis.'*

616 F.Supp. at 230–31 (emphasis added).

Of the cases discussed by Bourgeois in his petition, there remain two, only one of which is closer to home, and available: *Tupis v. Idaho*, No. HC 2807 (4th Dis., Ada Cty. March 8, 1988). The *Tupis* opinion appears to bear out Bourgeois' description of the case and sustain his contentions: "[W]hen an inmate was convicted of a disciplinary offense on the basis of an unconfirmed EMIT test, Judge Schmidt [the magistrate] ordered that Petitioner's record be expunged from the report." R. 7. District Court Judge D. Duff McKee in *Tupis* wrote:

In a writ of habeas corpus proceeding challenging the result of a penitentiary disciplinary action, the Magistrate granted petitioner his relief by vacating a disciplinary hearing order and expunging from the inmate's record all reference to the disciplinary proceedings.... The petitioner's complaints are all addressed to either the procedures at hearing or to the investigation procedures, particularly the use of urine testing for controlled substances.

No. HC 2807 (4th Dis., Ada Cty). As the magistrate had provided the petitioner with full relief for the disciplinary action complained of, Judge McKee ruled that the additional issues raised by the petitioner concerning the fairness of the institutional proceedings were moot, and he affirmed the magistrate's decision.

In his traverse to response, R. 42, Bourgeois also cited *Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986). There the district court refused to grant a summary judgment against an inmate who challenged disciplinary action taken against him which was predicated on a single EMIT test, the court stating that there was a genuine issue of material fact, namely the reliability of the test. 638 F.Supp. at 97.

Notwithstanding that the overwhelming weight of authority from other jurisdictions supported Bourgeois' contention that disciplinary action based on a single EMIT test violated due process, the magistrate found:

### CONCLUSIONS OF LAW

1. The EMIT test provides a sufficient basis for a finding of a disciplinary violation in the Penitentiary....
3. Petitioner's due process rights have not been violated.

R. 70.

*Jones v. McKenzie,* 628 F.Supp. 1500 (D.D.C.1986), is yet an additional authority which Bourgeois cites in the brief filed in *this* Court. It was there held that a school bus attendant discharged for testing positive to a single, unconfirmed EMIT test was entitled to a summary judgment that her discharge was arbitrary and capricious. The court made the following evaluation of the reliability of the EMIT test:

> Plaintiff establishes that the EMIT test was the sole basis for defendants' decision to terminate her employment. Moreover, it is undisputed that defendants failed to confirm the positive EMIT test report despite the manufacturer's clear label warning that 'positive results should be confirmed by an alternate method,' (*see* Soley Affidavit, Exhibit 9) as well as the Superintendent's express directive that a *'confirmed* finding of an illicit narcotic substance' is the approved basis for terminating an employee for drug abuse.
>
> . . . .
>
> A June 8, 1983 report by the Food and Drug Administration to several government agencies reviewing the EMIT test stated that 'it is important to remind users of this screening test that any positive result (as stated in the package insert) should be confirmed by an alternative method.' Plaintiff's Statement of Material Facts No. 51.
>
> A February 18, 1983 letter published by three toxicologists in the *Journal of the American Medical Association* states that 'adequate alternative confirmatory tests must be used' in urine tests for marijuana use. *Id.,* No. 50.
>
> A scientific advisory written by the United States Center for Disease Control and published by the Public Health Service of the Department of Health and Human Services on September 16, 1983, stated that '[a]ll urine samples positive by the cannabinoid assay need to be confirmed by an alternate method that is as sensitive as the screening test.' *Id.,* No. 49.
>
> A scientific study of the EMIT test by the United States Air Force School of Aerospace Medicine requires that all positive results be confirmed by gas liquid chromatography before being reported to local commanders or released to the Air Force. *Id.,* No. 48.
>
> Additional corroboration of the need for confirmation appears in the numerous decisions by state and federal courts around the country, including the opinion of an arbitrator in the District of Columbia, that a single, unconfirmed positive EMIT test is not a rational basis for disciplining the subject of the test. *In the Matter of Arbitration between American Federation of State, County and Municipal Employees, District Council 20, Local 2093, AFL–CIO and the Board of Education of the District of Columbia,* AAA Case No. 1639 0030 85H (Dec. 3, 1985); *see also Anable v. Ford,* No. 84–6033, slip op. [653 F.Supp. 22] (W.D.Ark., July 12, 1985); *Higgs v. Wilson,* No. 83–0256P(J), slip op. (N.D.Ky. Feb. 22, 1985); *Johnson v. Walton,* No. S61–84R, slip op. (Vt.Super.Ct. Feb. 14, 1984). Moreover, numerous court decisions have further established as a matter of court usage that confirmation is not effected by a manual

rerun of an automated EMIT test. *See, e.g., Crowell v. Wilkinson*, No. 82–1283, slip op. [1983 WL 1562] (M.D.Pa. Oct. 12, 1983). *Compare Peranzo v. Coughlin*, 608 F.Supp. 1504, 1507, 1514 and n. 16 (S.D.N.Y.1985).

*Jones v. McKenzie*, 628 F.Supp. at 1505–06.

Far, far from being in the least persuasive is the single case from Washington upon which the attorney general would have this Court deprive an inmate of his due process rights, *Petition of Johnston*, 109 Wash.2d 493, 745 P.2d 864 (1987). The best that can be said of that court's opinion is that it properly gives recognition to authority which has been relied upon by Bourgeois, *Peranzo v. Coughlin, Supt. v. Hill, Wolff v. McDonnell, Frye v. United States*, and, strangely to my mind, *Jensen v. Lick*. Bourgeois points out that the *Johnston* court reached a decision that was contrary to some of the very case law precedent with which it purported to support its decision, i.e., *Spence v. Farrier*, 807 F.2d 753 (8th Cir.1986), and *Peranzo v. Coughlin*, 675 F.Supp. 102 (S.D.N.Y.1987), which required that a second confirmatory test be made before the results of an EMIT test could be used in a disciplinary proceeding. *See Petition of Johnston*, 745 P.2d at 867.

Although we see considerable merit in the conclusions of those courts which have held that a single unconfirmed EMIT test is not sufficiently reliable to provide "some evidence" upon which disciplinary action may be based, it is an issue which we need not yet resolve, there being yet for our determination the challenge which Bourgeois has raised as to the validity of the State's procedure regarding the chain of custody of the urine samples which the inmates gave, under compulsion, and their match up with the samples which are tested at another distant place and at a later time.

## II. CHAIN OF CUSTODY

The magistrate in habeas corpus actions is the trier of disputed fact. This brings us to the second issue, namely, whether the State's handling of urine samples is consist-ent with the due process clause of the fourteenth amendment. We hold that the procedure as used was in violation of due process.

The magistrate found the following facts regarding the chain of custody of urine samples:

2. The Department of Corrections has a policy in place for the handling of urine samples taken from the prisoners.

3. The policy for handling urine samples as to chain of custody of evidence was followed....

5. There was no allegation or showing of any specific problem with the chain of custody of the urine sample.

R. 69–70. The magistrate made the following conclusions of law regarding the chain of custody:

2. The procedures of the Department of Corrections for handling urine samples is legally adequate and no variation from that procedure with regard to petitioner's sample has been shown.

3. Petitioner's due process rights have not been violated.

R. 70.

 Findings of fact by a magistrate will not be disturbed on appeal unless they are clearly erroneous. Where the findings are supported by evidence which is substantial and competent, though conflicting, appellate courts generally do not interfere; the Court does not presume error. I.R.C.P. 52(a); *Barber v. Honorof*, 116 Idaho 767, 770, 780 P.2d 89, 92 (1989).

The magistrate's finding of fact No. 5 was clearly erroneous. The magistrate found that "[t]here was no allegation or showing of any specific problem with the chain of custody of the urine sample." R. 70. Bourgeois, however, clearly alleged and proved a serious defect with the chain of custody. In his petition for habeas corpus and in his traverse to the response Bourgeois alleged that the prison authorities made no written documentation of the chain of custody of the urine sample. R. 4, 43, 45–50. Not only did Bourgeois make this allegation, but there is found in the record at page 37 this signed admission of

the State dated March 7, 1988, wherein the state had admitted the truth of the allegation: "[I]n the Response to Discovery, paragraph no. 3, Respondent [State of Idaho, *et al.*] states, there exists *no written documentation concerning chain of custody* of the urine sample taken from Petitioner." R. 47 (emphasis added by Bourgeois); *see* Response to Discovery, R. 37.

■ We hold as a matter of law that the State's procedure for handling urine samples violates a prison inmate's right to due process of the law under the fourteenth amendment. It is patently clear that the procedure does not include or even make a pretense of including, the critical documentation of the chain of custody of an inmate's urine sample. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Wykoff v. Resig,* 613 F.Supp. 1504 (D.Ind.1985). Not particularly commendable was the State's continuation of the prosecution and punishment of Bourgeois when in his briefing for the lower courts he made the State, as well as those courts, aware of the case law precedent which was almost 100 percent with him.

*Wolff v. McDonnell* set out the requirements of the due process clause of the fourteenth amendment which prison officials must meet before they can impose solitary confinement or loss of good time credits on an inmate in a disciplinary hearing. 418 U.S. 539, 94 S.Ct. 2963. These requirements were summarized in *Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986):

> Before a prison inmate may be deprived of a protected liberty interest in good time credits, the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974).

*Pella,* 638 F.Supp. at 96.

*Wykoff v. Resig* discussed in great detail the *Wolff* due process requirements as they pertain to the chain of custody of a urine sample taken for drug testing purposes:

### Chain of Custody of Urine Sample

It should be understood that the species of due process which applies to CAB proceedings, as announced in *Wolff v. McDonnell, supra,* is of a limited variety. However, minimum due process is important and must be followed by correctional authorities when applicable. The *Wolff* standard certainly does not give a due process carte blanche to correctional officers. Neither does the *Wolff* minimum due process standard presume the absolute good faith and integrity of all correctional officers at all times under all circumstances. To the contrary, it requires certain procedural minimum and frames them in constitutional terms.

Correctional officers are explicitly authorized to take urine samples from inmates. This practice is a necessary one. The manner in which this sensitive process is accomplished must comport with the due process standard defined in *Wolff.* . . .

*Wolff* certainly requires that the handling and processing of such inmate samples be done in such a way as to insure the basic integrity of the system. An inmate has a legitimate liberty interest in this subject matter and has a right to expect minimal due process safeguards to insure that samples are not mishandled by correctional officers. Given the realities of the correctional setting, these procedures must be reasonably definite and must be fully and carefully documented at all stages. Such procedures serve the best interests of the correctional system as well as the limited due process rights of the inmate.

*Wykoff,* 613 F.Supp. at 1512–13.

*Wykoff* went on to further outline the steps prison officials must take to satisfy prison inmates' due process rights:

> The Indiana DOC should seal urine samples in the presence of the inmate donor, keep a written record on the location and

transportation of urine samples at all times, and while the samples are still in the possession of the DOC, it should store the urine samples in locked refrigerators with very limited access. Furthermore, the minimum due process requirements defined in *Wolff v. McDonnell, supra,* requires that inmates receive a duplicate copy of the EMIT test results from the laboratory which conducted such test.

*Wykoff,* 613 F.Supp. at 1514.[5]

The critical importance of a written chain of custody should be obvious. If there is no documentation of the chain of custody, an inmate would be severely hampered, if not completely obstructed, in presenting a defense to the disciplinary charges by challenging the test results. Therefore, when there is no documentation of the chain of custody to show that that which was analyzed by the laboratory came from the inmate in question, there is no test from a legal standpoint.

As the federal district court in *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky.1985), noted: "Thus, the danger of a 'clean' inmate receiving disciplinary action for a 'dirty sample' is greatly increased, *especially since the inmates cannot call the lab technician to testify, and often cannot call other actors in the chain of custody.*" *Higgs* at 231–32 (emphasis added). Such seemingly was the situation in Bourgeois' hearing, where the presence of one witness, Officer May, was denied because his attendance would require paying overtime. The problem of the inmate being hampered in presenting his or her defense is obviously further exacerbated where the inmate is deprived of any opportunity to ascertain who handled the sample.

The State in response to Bourgeois' petition raised the contention that it is up to the inmate to prove, "by evidence offered by himself, that there [is] some problem with the chain of custody of the urine samples given." R. 23. The state outlined the procedure which is "supposed" to be followed, and then asserted that "[t]he above outlined procedures are followed in every case...." R. 22. Such is insufficient. The state must meet the minimum due process standard set out in *Wolff,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and elaborated upon in *Wykoff,* 613 F.Supp. 1504. The *Wolff* minimum due process standard requires that prison officials document in writing the chain of custody of urine samples taken for drug testing purposes. The magistrate's finding of adequacy in the State's drug testing procedure in the instant case is reversed, as also is the district court's conclusion on that point.

The magistrate and the district courts are reversed in the chain of custody issue, and the cause is remanded to the district court for further proceedings which by that court are deemed to be in order and in conformance with this opinion.

JOHNSON and McDEVITT, JJ. concur.

BAKES, Chief Justice concurring in part and dissenting in part:

The majority states that the issue of whether or not a single unconfirmed EMIT test is sufficiently reliable to provide "some

---

5. In addition to the federal *Peranzo* and *Storms* cases, discussed above in regard to the single EMIT test, there is yet another recent case from the Southern District of New York which should be brought to the attention of the Board of Corrections and the attorney general. The opinion in that case was authored by another jurist, the Honorable Abraham D. Sofaer, United States District Judge. In a civil case brought by an inmate and his wife based upon the violation of the inmate's due process rights, including his being placed in detention, the plaintiff-inmate was awarded compensatory damages in the sum of $50,000, the inmate's wife was awarded $25,-000 compensatory damages, and the two plaintiffs together were awarded $5,000 in punitive damages. The final statement of Judge Sofaer was:

> This case illustrates that, regardless of the practical and jurisprudential justifications for limiting the recent flood of largely meritless *pro se* prisoner petitions, the federal courts must remain open to vindicate claims such as the one brought by the Morrisons in this action. If the promise of due process is to remain real, the federal courts must ensure that prison officials will not be permitted to oppress their wards with fraudulent charges, particularly as a form of official revenge for protected activities.

*Morrison v. Lefevre,* 592 F.Supp. 1052, 1082 (S.D.N.Y.1984).

evidence" upon which a disciplinary action may be based in a prison setting "is an issue which we need not yet resolve" in this case. *Ante* 119 Idaho at 609, 809 P.2d at 480. However, the majority nevertheless professes, in *dicta*, to "see considerable merit in the conclusions of those courts which have held that a single unconfirmed EMIT test is not sufficiently reliable to provide 'some evidence' upon which disciplinary action may be based." That *dicta* needs more analysis and comment. Furthermore, the majority's analysis in Part II dealing with the chain of custody is erroneous.

I

With regard to Part I, the question of whether a single EMIT test is sufficiently reliable to provide "some evidence" upon which a disciplinary action may be based, the applicable legal standard of review of a prison disciplinary proceeding decision was most recently expressed by the United States Supreme Court in *Superintendent, Mass. Corr. Institution v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), in which the Court reviewed its earlier holding in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and reaffirmed the "some evidence" rule, stating that "where good time credits constitute a protected liberty interest, a decision to revoke such credits must be supported by *some evidence.*" 472 U.S. at 447, 105 S.Ct. at 2770 (emphasis added).

Citing *Wolff* in various places, the *Hill* Court elaborated on the "some evidence" standard, stating:

We hold that *the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witness, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board....*

472 U.S. at 456, 105 S.Ct. at 2774 (Citations omitted, emphasis added).

The "some evidence" standard, which requires only a "modicum of evidence to support a decision to revoke good time credits," is an even lesser standard than is required in the ordinary civil action, where the burden of proof is by a preponderance of the evidence, which means more probable than not. *Ebert v. Newton*, 97 Idaho 418, 546 P.2d 64 (1976); *Big Butte Ranch Inc. v. Grasmick*, 91 Idaho 6, 415 P.2d 48 (1966) ("'Preponderance of evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and from which it results that the greater probability of truth lies therein.").

However, in a prison disciplinary proceeding, the evidentiary burden on prison officials is even less than in an ordinary civil proceeding. The U.S. Supreme Court in *Hill* held that there need only be a "modicum of evidence to support a decision to revoke good time credits." 472 U.S. at 454, 105 S.Ct. at 2773. The Court stated that "[a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board...." 472 U.S. at 456, 105 S.Ct. at 2774 (emphasis added).

The standard of a factfinder in an ordinary civil case, *i.e.*, the more probable than not standard, is essentially a 51% standard. It is a higher standard than the "some evidence" standard applicable to prison disciplinary proceedings. However, in this case evidence showed that Bourgeois' positive EMIT test was 95% accurate. That standard of proof, 95%, while it might not be sufficient in a criminal prosecution where the burden of proof is on the state to prove the disputed fact "beyond a reasonable doubt," is more than adequate in a

civil action such as Bourgeois' *habeas corpus* action, where the burden of proof was on him and the standard was more probable than not. The evidence of a 95% accuracy of the EMIT test is sufficient, particularly in a prison disciplinary proceeding where, according to *Hill*, only a "modicum of evidence" or "some evidence" is required to support a disciplinary action. Thus, I cannot agree with the *dictal* statement of the majority that there is "considerable merit" in the conclusions of those courts which have held that a single unconfirmed EMIT test is not sufficiently reliable to provide "some evidence" upon which disciplinary action may be based. *Ante* 119 Idaho at 609, 809 P.2d at 480. The prior case law of this Court and the United States Supreme Court is to the contrary.

Recently in *Cootz v. State*, 117 Idaho 38, 785 P.2d 163 (1989), we set out the standard to be applied in prisoner disciplinary proceedings. In *Cootz*, the plaintiff filed a petition for a writ of *habeas corpus*, alleging that he was denied due process in a disciplinary hearing because, among other reasons, "no evidence had been presented at the disciplinary hearing to sustain a finding of guilt." 117 Idaho at 39, 785 P.2d at 164. We quoted much of the above language from *Hill*, holding that:

> [W]e are persuaded that the 'some evidence rule' formulated by the Supreme Court in *Hill* is the appropriate one for us to adopt in prison discipline cases. The rationale given by the Supreme Court for this rule seems sound in light of the complexity of the prison setting. *In Hill the Court dealt with the revocation of good time credits. Here, we deal with disciplinary detention. We do not find any significant difference in the liberty that is impaired by one compared to the other.*

117 Idaho at 41, 785 P.2d at 166 (emphasis added). We further held that:

> While we are prepared to accept the 'some evidence' standard establish in *Hill*, we are not prepared to overlook the written finding requirement of *Wolff* in determining whether there is some evidence to support the hearing officer's decision. If we were to do so, we would

open the door to post-hearing rationalizations whenever a prisoner challenged the sufficiency of the evidence stated in the written findings. It is not a heavy burden to place on our correctional officials to require them to state in their disciplinary decisions the evidence upon which they relied. *Wolff* requires it. So do we. *We will look only to the written findings made at the time the discipline was ordered to determine if there was some evidence to support the decision.*

117 Idaho at 42, 785 P.2d at 167 (emphasis added).

In this case, the magistrate made a specific finding that the EMIT test has a 95% reliability without additional testing. Certainly a reliability of 95% is a "modicum of evidence" as is required under *Hill* and *Cootz, supra*. 51% is adequate in most civil proceedings. As the U.S. Supreme Court stated in *Hill*, "the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board." 472 U.S. at 455–56, 105 S.Ct. at 2774 (emphasis added). In this case, the single positive EMIT test provided that evidence.

Other states which have clearly focused on the correct scope of their review, *i.e.*, the "some evidence" standard, have affirmed prison disciplinary actions based on a single EMIT test. For example, in *Petition of Johnston*, 109 Wash.2d 493, 745 P.2d 864, 868 (1987), the Washington Supreme Court applied *Hill* to hold that "a single positive result to an EMIT urinalysis test clearly provides some evidence of marijuana use." The Washington court relied upon several other cases which found the EMIT test to be approximately 95 percent accurate, and upon "expert affidavits which described the EMIT test as 'extremely reliable', 'highly reliable', or 'very reliable.'" 745 P.2d at 868; *see Jensen v. Lick*, 589 F.Supp. 35 (D.N.D.1984); *Harmon v. Auger*, 768 F.2d 270 (8th Cir.1985); *Lovvorn v. Chattanooga*, 647 F.Supp. 875 (E.D.Tenn.1986); and *Peranzo v. Coughlin*, 675 F.Supp. 102 (S.D.N.Y.1987). Although in *Johnston* two other experts testified that a single EMIT test might be only

75 percent accurate, the court stated that "[t]his discrepancy in findings would be troubling in the context of a criminal trial, in which the State bears the burden of proving beyond a reasonable doubt that the defendant has used illegal drugs. In light of the lesser evidentiary standards applicable in prison disciplinary hearings, we deem these differences immaterial." 745 P.2d at 868. The Washington court correctly applied the "some evidence" standard and upheld the discplinary proceeding.[6]

Another case, *Jensen v. Lick*, 589 F.Supp. 35 (D.C.N.D.1984), reached the same conclusion as that in *Johnston*. There, in considering the admissibility of a single EMIT test, the court stated that "[s]ince the material furnished by the plaintiff establishes that the test can be relied upon with 95% confidence in the accuracy of the test result; and since that is tantamount to *almost complete certainty*, I conclude that such a level of reliability is adequate to support a decision for administrative punishment in the prison circumstance...." 589 F.Supp. at 39 (emphasis in original).

The requirement of specific written findings in both *Wolff* and *Hill, supra,* were followed in this case. The written disciplinary offense report specifically stated that the disciplinary officer relied upon the positive results of the EMIT test in deciding to punish Bourgeois. That is all that was required by the magistrate. *State v. Cootz, supra.* The majority opinion's suggestion to the contrary is erroneous *dicta.*

## II

I further disagree with the majority's holding that "the state's procedure for han-

dling urine samples violates a prison inmate's right to due process of the law under the fourteenth amendment as the procedure does not include written documentation of the chain of custody of the urine sample." *Ante* 119 Idaho at 609, 809 P.2d at 480. As the majority's opinion itself states, "[f]indings of fact by a magistrate will not be disturbed on appeal unless they are clearly erroneous. Clear error will not be deemed to exist if the findings are supported by substantial, and competent, though conflicting, evidence. I.R.C.P. 52(a); *Barber v. Honorof,* 116 Idaho 767, 770, 780 P.2d 89, 92 (1989)." *Ante* at 619 –620, 809 P.2d at 480–481. Bourgeois did not allege, nor did he put on evidence, that there was a specific problem with the chain of custody in this case. Rather, he merely alleged that there was no written documentation of the state's procedure regarding the chain of custody of his urine sample. The magistrate made the findings of fact that "the policy for handling urine samples as to chain of custody of evidence was followed" and that "there was no allegation or showing of any specific problems with chain of custody of the urine sample." Bourgeois has made no showing that this finding was clearly "erroneous." I.R.C.P. 52(a). Nor has the majority in its opinion.

The magistrate put the burden of proof on Bourgeois, as he properly should have in a *habeas corpus* case, and found that the prison policy regarding chain of custody was followed. *Jackson v. State,* 87 Idaho 267, 392 P.2d 695 (1964) ("The authorities uniformly hold that the burden is on the petitioner in *habeas corpus* proceedings to

---

**6.** The majority alleges that *Johnston, supra,* on which the state relies to support its argument in favor of upholding the magistrate's decision, "reached a decision that was contrary to the case law it used to support its decision, i.e., *Spence v. Farrier,* 807 F.2d 753 (8th Cir.1986) and *Peranzo v. Coughlin,* 675 F.Supp. 102 (S.D. N.Y.1987)...." *Ante* 119 Idaho at 609, 809 P.2d at 480. Both *Peranzo* and *Spence* upheld the use of an EMIT test when used with a "confirmatory second test." However, the *Johnston* court did not primarily rely on *Peranzo* and *Spence* to hold that a single, positive EMIT test is sufficient. In fact, the court relied on these cases to support its conclusion that the standard

regarding the admissibility of scientific evidence in criminal trials, set out in *Frye v. U.S.,* 293 F. 1013 (D.C.Cir.1923), is not "applicable in the context of prison disciplinary proceedings." 745 P.2d at 867. The *Johnston* court also relied on the statistics mentioned in *Peranzo* regarding the favorable accuracy of the EMIT test. In fact, the *Johnston* court specifically and primarily relied on *Hill, supra,* to support its holding. "Applying the evidentiary ["some evidence"] standard enunciated in *Hill,* we conclude that *a single, positive result to an EMIT urinalysis test clearly provides some evidence of marijuana use.*" 745 P.2d at 868 (emphasis added).

establish the illegality of his detention."). The district court erroneously switched the burden of proof. We should uphold the magistrate's decision. I.R.C.P. 52(a); *Barber, supra.*

The majority cites *Wolff, supra,* in support of its claim that the lack of written documentation on the state's chain of custody procedure violated the plaintiff's due process rights. However, that is not the holding in *Wolff. Wolff* merely requires that prison officials state in writing the evidence upon which they relied to initiate a disciplinary action against an inmate. *Wolff* does *not* require written documentation of the chain of custody of a urine specimen. The prison officials complied with the *Wolff* writing requirement in this case. The written report specifically states that the hearing officer relied upon the positive EMIT test result. Further, in *Wykoff v. Resig,* 613 F.Supp. 1504 (D.C.Ind. 1985), on which the majority relies heavily to support their conclusion that the state's failure to document the chain of custody violated Bourgeois' constitutional right to due process, there was no written documentation as to the chain of custody of a urine specimen, yet the court did not reverse because of that failure. The *Wykoff* court first noted that "[p]laintiff has introduced no evidence showing that someone had tampered with his urine sample." 613 F.Supp. at 1514. The court then held that "the handling of plaintiff's urine sample was adequate, and that the disciplinary sanctions imposed upon plaintiff should not be disturbed here." 613 F.Supp. at 1514. While the court went on to suggest steps that could be taken to document a chain of custody, these steps were not required in the case because it was demonstrated that the chain of custody was adequate.

In this case, the magistrate also found that a proper chain of custody was followed because Bourgeois neither alleged nor proved any chain of custody problem. The district court's decision, however, put the burden upon the Department of Corrections to show that the test was accurate beyond any doubt and that the proper chain of custody was followed, and that there were no errors in the process. That standard would be appropriate if this were a criminal case in which the state has the burden of proof beyond a reasonable doubt. However, this is a *habeas corpus* decision in which the defendant has the burden of proof by a preponderance of the evidence. The rule, according to *Hill* and *Cootz, supra,* is that if there is even a modicum of evidence to support the disciplinary action taken, the courts must affirm the disciplinary authority, which is the finder of fact. The district court, and now this Court, has failed to apply the correct evidentiary test and standard of review. If the correct standard were applied, the magistrate's decision would easily be affirmed. Accordingly, the decision of the district court should be reversed and the decision of the magistrate affirmed.

BOYLE, J., concurs.

BOYLE, Justice, dissenting.

I respectfully dissent from the majority opinion and join in the dissent of the Chief Justice. As an initial observation, the majority opinion is troublesome to me because it cites with approval, and as having "considerable merit," those cases which hold that a single EMIT test is not sufficiently reliable to provide some evidence upon which disciplinary action may be based, and then concludes that it is not necessary to address or resolve that issue. Although that portion of the majority opinion is clearly dicta and it will obviously leave the impression—along with resulting confusion—that this Court is condemning the use of a single EMIT test when that issue was not actually resolved, my concern in this case is even more basic and fundamental.

In many of the cases cited by the majority, the appellate courts' holdings that a single EMIT test was unreliable, were based on the evidence presented to the trial court. In the case presently before us the magistrate court made its findings and conclusions after hearing and considering the evidence presented. The evidence before the magistrate established that a single EMIT test is ninety-five percent accurate.

**626**

Certainly this is "some evidence" or a "modicum of evidence" as contemplated by the United States Supreme Court in *Superintendent, Mass. Corr. Institution v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In my opinion the legal standard established in those cases has been satisfied in the instant proceedings. *See also Cootz v. State*, 117 Idaho 38, 785 P.2d 163 (1989).

I also dissent from the majority's holding that the record does not establish an adequate chain of custody of the urine sample. The magistrate, after hearing and considering the evidence presented to him, found that an adequate chain of custody was established and that the policies and procedures involved in handling the urine sample had been followed.

The trial court has broad discretion and its judgment in the fact finding role will only be disturbed on appeal when there has been a clear abuse of discretion. *State v. Giles*, 115 Idaho 984, 772 P.2d 191 (1989); *State v. Crook*, 98 Idaho 383, 565 P.2d 576 (1977); *State v. Griffith*, 94 Idaho 76, 481 P.2d 34 (1971). At the trial court level the trier of fact, in this case the magistrate court judge, is the arbiter of conflicting evidence. *Rankin v. Rankin*, 107 Idaho 621, 691 P.2d 1236 (1984). It is the province of the trier of fact to weigh the conflicting evidence and testimony and to judge the credibility of witnesses. *Pointner v. Johnson*, 107 Idaho 1014, 695 P.2d 399 (1985); *Glenn v. Gotzinger*, 106 Idaho 109, 675 P.2d 824 (1984); *Jensen v. Westberg*, 115 Idaho 1021, 772 P.2d 228 (Ct.App. 1988). In view of this role, the trial court's findings of fact will be liberally construed in favor of the judgment entered. *Rueth v. State*, 103 Idaho 74, 644 P.2d 1333 (1982); *Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988 (1979). It is well established that a trial court's factual findings which are based on substantial although conflicting evidence will not be disturbed on appeal. The credibility and weight to be given evidence is in the province of the trier of fact, and the findings made by the trial judge will not be set aside unless clearly erroneous. *MacNeil v. Minidoka Memorial*

*Hosp.*, 108 Idaho 588, 701 P.2d 208 (1985); *Pointner v. Johnson*, 107 Idaho 1014, 695 P.2d 399 (1985); *State v. Campbell*, 104 Idaho 705, 662 P.2d 1149 (1983).

In light of the foregoing standards I would affirm the factual findings of the magistrate court that the single EMIT test is ninety-five percent accurate and thus reliable, and that the chain of custody was established. Accordingly, "some evidence" or a "modicum of evidence" is contained in the record sufficient to justify disciplinary proceedings.

BAKES, C.J., concurs.