695 P.2d 399

**John C. POINTNER and Callie S. Pointner, husband and wife, Plaintiffs-Appellants,**

**v.**

**Earl M. JOHNSON, a widower, et al, Defendants-Respondents.**

**No. 14610.**

Supreme Court of Idaho.

Feb. 4, 1985.

Charles M. Dodson, Coeur d'Alene, for plaintiffs-appellants.

Scott Reed, Coeur d'Alene, for defendants-respondents Johnson and Estate of Healy.

Robert Trabert, Boise, for defendant-respondent Idaho Transp. Dept.

Walter G. Robillard (argued), Atlanta, Ga., and Charles B. Lempesis, Coeur d'Alene, for amicus curiae.

SHEPARD, Justice.

This is an appeal from a judgment in favor of defendants-respondents in a boundary dispute action wherein plaintiffs-appellants Pointner sought to quiet title to certain property by establishing the west boundary line of the Pointner property. We affirm.

Pointners brought an action to quiet title to the North half of the Southwest ¼ and the South half of the Northwest ¼ of Section 22, Township 50 North, Range 4 West, Boise Meridian, located in Kootenai County, Idaho. U.S. 95 runs generally north and south along the western boundary of the Pointner property, and the defendants-respondents own lands or easements adjacent to the west side of the Pointner property. The essence of the dispute is the location of the west line of the Pointner property and whether the west quarter corner is either lost or existent.

The Pointners purchased their property consisting of 160 acres, which lies along Cougar Bay of Lake Coeur d'Alene, in 1961. They became concerned about the accuracy of the location of the northwest corner of the property, specifically the west quarter corner. This corner lies in a swamp which is and has been subject to annual high water overflow from Lake Coeur d'Alene. Thus it is potentially difficult to preserve corner monumentation. That condition was aggravated by the construction of the Post Falls dam in the early 1900's.

The original General Land Office survey of the Section 22 land was made by United States Deputy Surveyor W. Clayton Miller in 1891, a year following Idaho's admission to the union. Federal law prohibited the disposition of land to private parties until a survey had been made and monuments placed on the ground. I. Tillotson, *Legal Principles of Property Boundary Location on the Ground in the Public Land Survey States* 14–15 (1973). In the law of surveying, a monument is a physical object, natural or artificial, on the ground which helps establish a boundary line.

At the time of the original 1891 survey, landowners were aware of the problems created by the lack of well-marked boundaries. Some of the original colonies had laws which required owners of contiguous property to walk their boundaries together. The first public surveys had been made under an ordinance passed by the Continental Congress on May 20, 1775, which had provided for the rectangular system of surveying. The rectangular system had been devised to divide the Public Domain into an orderly arrangement of sections by placing markings upon the ground to fix legal subdivisions for all time. *Manual of Surveying Instructions for the Survey of the Public Lands of the United States* 6 (1930). The first public land survey act was enacted by the Congress in 1785 and as practical knowledge of survey problems was gained, eight subsequent clarifying acts were passed in later years. Tillotson, *supra* at 15.

Various regions of the United States have been surveyed under different sets of instructions issued at different periods beginning in 1785. The earliest rules were given to surveyors in printed circulars. Later enactments and court decisions specified that these written directions to surveyors would become the law governing the boundaries of lands surveyed or resurveyed under those directions. More detailed surveying regulations and instructions were issued in book form in government manuals of 1855, 1881, 1890, 1894, 1902, 1930, 1947, 1973. At the time of the 1891 Miller survey of the lands at issue here, surveyors performed their work under contracts with the government. Miller was furnished with a copy of the 1890 manual, as well as with the special instructions in the contract to guide him in carrying out the survey. That contract specifically advised:

"... Your survey will be inspected in the field by someone under the direction of The Hon. Commissioner of the General Land Office, prior to payment of the survey accounts; and all work must be up to the standard required in the Manual...."

"In the execution of your surveys, give careful attention to the establishment of all corners; that they be correctly placed, marked and described is of paramount importance....

"Stones should be used for monuments wherever they can be obtained. You are earnestly requested to use stones for this purpose, if possible. They are much preferable to wooden stakes...."

In accordance with the manual requirement, Miller kept detailed field notes of the survey, which indicate that he proceeded north from the southwest corner of Section 22 on a course of north 0° 12′ east and that this course continued unchanged from the southwest corner to the northwest corner. He was acting under specific instructions which required that all north and south section lines run parallel to the east boundary of the respective township. Miller then set the quarter corner in a swamp midway between the southwest corner and the northwest corner at a distance of 40 chains from the southwest corner. His notes indicate the setting of the west quarter corner as follows:

*"18 ch.* Leave timber and enter swamp, bears NE & SW, covered with dense undergrowth of willow and alder. *40 ch.* Wagon road bears E & W. *Set a post 3 ft. long, 3 ins. square with marked stone 12 ins. in ground for ¼ Sec. cor. marked ¼ S on W face, dug pits 18x18x12 ins. N & S of post 5½ ft. dist. and raised a mound of earth 1½ ft. high, 3½ ft. base alongside [sic] around post. Cabin bears West 3 chs.*

*60 chs.* Leave swamp and enter heavy timber. Cabin bears East 3 chains." (Emphasis added.)

Miller thus set the post in the ground as a corner monument at the point determined to be the quarter corner, and placed the marked stone 12 inches into the ground as a memorial to that corner. A memorial serves to identify the location of the corner in the event the monument itself is destroyed. The pits and mound of earth were monument accessories placed to aid in iden-

tifying the position of the monument. It was not until the manual of 1930 that the use of iron-post corner monuments was required in order to add to the permanency of evidence of surveys.

The area in question here was resurveyed in 1908 by A.O. Modlin, who concluded that the wooden post monument of the west quarter corner had disappeared. Modlin stated in his field notes that the west quarter corner had been "lost for several years and no one knows, or claims to know its location." Modlin, therefore, in accordance with the manual, set the corner using the proportionate measurement method of corner relocation by establishing the quarter corner at the mid-point on a straight line between the found southwest and northwest corners of the section. The original southwest and northwest corners of Section 22, as established by the original 1891 G.L.O. survey, had been located and maintained over the years, and there is no dispute between the parties as to the location of those corners.

Subsequent surveyors, Adams in 1940, Kindler in 1962, Nobis in 1964, and Booth in 1974 and 1977, also concluded that Miller's 1891 original west quarter corner was lost. Other surveyors working for the State Highway Department during the 1970's reached the same conclusion.

Pointner was not satisfied with the work of the earlier surveyors and he personally continued to investigate the western boundary of his property. He asserted that in 1964, he found an 11″ × 18″ × 14″ stone in the swamp, near his western boundary, and also claimed to have found a square hole in the ground that could have contained the original wooden post, some changes in soil colors, evidence of dug-out pits and a pre-1900 bottle. Pointner asserted that the stone was the original memorial to the west quarter corner, but surveyors Nobis and Booth, who were hired by Pointner after the stone had been found, both rejected the conclusion that it was the memorial to the quarter corner established by the 1891 original Miller survey.

In 1978, Pointner retained Earl Erdman of O.T. Hanson & Associates to perform a dependent resurvey of Pointner's land.[1] Erdman worked on the project during 1978 and 1979, but his license to survey was revoked for incompetence and he was barred from any survey work in Idaho after June 1979.

In 1980, Erdman joined with Eugene Sine, a licensed surveyor, to complete the survey of the Pointner lands. Erdman and Sine accepted the rock assertedly found by Pointner as the memorial to the original quarter corner and drew up their survey accordingly. Thereafter, Pointner brought the instant action to establish his western boundary line in accordance with the Sine-Erdman survey. The location of the quarter corner, as contended for by the Sine-Erdman survey, would result in the western boundary line of the Pointner property moving a considerable distance to the west. That western boundary line would have a kink or warp in it, with a considerable variance from the course and distances contained in the field notes of the 1891 original G.L.O. Miller survey. This additional property, which would be added to the Pointner land, is the subject of the instant quiet title action.

Following trial, the court concluded that the true west quarter corner was a lost corner and that Pointner's proof was not convincing to sustain a holding that it was a partially obliterated but existent, corner. The court held that the boundary should remain as a straight line from the south-

1. A resurvey is a reconstruction of land boundaries and monuments of the original survey, accomplished by re-running and re-marking the lines represented in the field note record or on the plat of a previous official survey. *Manual of Surveying Instructions* 145 (1973). *See also Cragin v. Powell,* 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566 (1888); *Bayhouse v. Urquides,* 17 Idaho 286, 105 P. 1066 (1909). A dependent resurvey is a retracement and reestablishment of the lines of the original survey according to the best available evidence of the positions of the original corners, Manual (1973), *supra* at 145, and is based upon identified original corners and other acceptable points of control and second upon the restoration of lost corners by proportionate method in harmony with the record of the original survey. *See id.* at 149.

west to the northwest corner of Section 22, and that the quarter corner was at a point on that line equidistant between those section corners.

■ The trial court carefully examined any information which might shed light on the actual position of the original monument or its memorial. The evidence in the record demonstrates the questionable nature of Pointner's contended corner location and supports the trial court's holding that the west quarter corner of Section 22 was in fact a lost corner. The credibility and weight to be given evidence is in the province of the trier of fact, and the findings of fact by the trial judge will not be set aside unless clearly erroneous. *Skelton v. Spencer*, 98 Idaho 417, 565 P.2d 1374 (1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758; I.R.C.P. 52(a).

We hold that here there is no clear error in the findings of the trial court. An existent corner "is one whose position can be identified by verifying the evidence of the monument or its accessories, by reference to the description in the field notes, or located by an acceptable supplemental survey record, some physical evidence, or testimony." *Manual of Surveying Instructions* 130 (1973). An obliterated corner "is one at whose point there are no remaining traces of the monument or its accessories, but whose location has been perpetuated," or may be recovered by acts and testimony of interested landowners, competent surveyors, witnesses, or by some acceptable record evidence. *Id.* A lost corner is one whose position cannot be determined, either from original or reliable marks, or reliable external evidence. *Manual* (1973), *supra* at 138; *Case v. Ericson*, 44 Idaho 686, 258 P. 536 (1927).

■ A fundamental principle of the law of surveying is that absolute permanency is attached to official public land surveys. Original government monuments control the boundary even if they have been erroneously set in the original official public land survey, and they are controlling over any inconsistent courses and calls in the field notes. *Palmer v. Fitzpatrick*, 97 Idaho 925, 557 P.2d 203 (1976); *Johnson v. Dunn*, 46 Idaho 25, 266 P. 1099 (1928). Thus, a proven original corner controls the location of the corner as against a point established by relocation methods. *Rich v. Burdick*, 83 Idaho 335, 362 P.2d 1088 (1961). Therefore, in the case at bar, if the stone and alleged accessories asserted to have been found by Pointner, actually memorialized the west quarter corner as set by Miller in 1891, the corner is existent and will control the west boundary line.

However, if the evidence of the alleged memorial and accessories is unconvincing, the west quarter corner cannot be said to be existent, but rather must be restored by using the proportionate measurement method, *i.e.*, calculating the corner as being midway between the found southwest and northwest corners. *See Case v. Erikson, supra*. Replacing a lost corner by the proportionate method does not guarantee that the restored corner will occupy the same position as set in the original government survey. However, the method harmonizes surveying practice with legal and equitable considerations concerning lost land boundaries. J. Grimes, *Clark on Surveying and Boundaries* (4th ed. 1976), p. 267. The proportionate measurement method of relocating a lost corner is always employed unless outweighed by conclusive evidence of the original survey. *Manual* (1973), *supra* at 133.

■ Greater weight is attached to authentic evidence relating to the original position of an official corner monument than is attached to the technical evidence relating to bearings and lengths of lines. When a monument itself is obliterated, the accessories furnish the highest evidence of the location of the original monument and therefore such accessories are of prime importance in relocating the corner position. J. Grimes, *Clark on Surveying and Boundaries* 455 (1976). Here, however, none of the surveyors found the original corner monument as set by Miller in 1891, *i.e.*, the stake, which would be direct evidence of that corner.

corner position which depends upon the use of collateral evidence can be accepted only when duly supported and such support is generally achieved through proper relation to known corners, agreement with the field notes, or unquestionable testimony. *Manual* (1973), *supra* at 130. Review of the evidence here demonstrates that such support is lacking. The field notes reflect a straight line between the section corners, but if the west quarter corner is located as sought by Pointner, there is a 3°28′ kink or warp in the section line. The contract directions to Miller's 1891 survey did not condone any kinks in section lines. If the quarter corner were located as contended by Pointner, there would be a 400-foot disparity between the north and south halves of the section line.

There are discrepancies between the field notes and the location as sought by Pointner. The field notes indicated the setting of a post 3 ft. long and 3 ins. square with a marked stone placed 12 ins. in the ground as the location of the section corner. The contract under which Miller surveyed specifically indicated a preference for stone monuments, and the trial court concluded that an 11″ × 14″ × 18″, 75 pound stone allegedly found by Pointner would not have been used in the Miller survey as a memorial, but that it would have been used as the actual monument. Hence, a much smaller stone would have been used as a memorial.

There was much conflicting testimony at trial concerning whether there were man-made markings (either a "¼S," or a "¼" and/or an "X") on the stone. The trial court found that there were no valid visible markings on the stone, and that if the stone was in fact marked, it was not marked and placed in conformance with the 1890 manual of surveying instructions. The 1890 manual required that two bearing trees be established for every quarter section corner when two trees could be found within 300 links of the corner point. Miller's notes make no mention of bearing trees as monument accessories. Evidence at trial indicated that if the corner were located at the position sought by Pointner, there would have been trees within the prescribed distance that should have been used as bearing trees. The location of the corner as sought by Pointner at the point where he allegedly found the stone is not consistent with the place from which Miller says he ascended and left the swamp. In Miller's field notes a cabin was mentioned as three chains west. If the location of the corner as sought by Pointner is accepted, the old cabin site would have been at an unlikely location, *i.e.*, upon a steep hillside.

Pointner asserts also that he found a pre-1900 bottle bottom and glass shards near the stone and that such is further evidence of the original corner placement in 1891. However, the field notes do not refer to the placement of a bottle as an accessory and "The evidence of a rock mound is of little importance where the original notes call for an oak tree." C. Brown and W. Eldridge, *Evidence and Procedures For Boundary Location* 12 (1967).

Three surveyors, whose competence is unquestioned, determined that the west quarter corner was lost and they each restored it using the proportionate measurement method. The court gave considerable weight to the 1908 determination of Modlin that the corner was lost since Modlin had had the opportunity to talk with people who had lived in the area, some having lived there prior to the original Miller survey in 1891. The trial court pointed out that Modlin would have had the opportunity to observe lines of occupation and fence lines.

[5] trial court attached little probative value to the Sine-Erdman survey because much of that field work was done by Mr. Erdman after his license to survey had been revoked because of professional incompetence. That finding was within the province of the trial judge in determining the weight to be given evidence.

[6] contends that the trial court erred in refusing to admit in evidence certain notes and records and a photograph allegedly showing a "drifting" fence line. Amicus also argues that the court erred by refusing to admit and consider this evi-

dence, as it allegedly shows the overall pattern of the original survey, which is critical in locating the original corner. We hold that the court properly refused to admit Erdman's field notes because a proper foundation had not been laid. These notes and records were prepared and filed by Erdman, who was present in the trial court but not called as a witness. Pointners attempted to introduce those exhibits with the testimony of Sine, who was an incompetent witness for that purpose as he had no personal knowledge of the documents or the accuracy of the work. The 40 pages of Erdman's field notes which were made or directly supervised by Sine were admitted, but the 70 pages of Erdman's field notes not made or directly supervised by Sine were excluded. Six corner perpetuation and filing records signed by Erdman were excluded, while the 12 remaining records signed by Sine were admitted. We find no error in those evidentiary rulings of the trial court. *See Brown, supra* at 31.

We lastly consider the assertion that the trial court erred in excluding from evidence a photograph tendered by appellant which was offered to demonstrate that the fence showed a drift to the east, but the trial court ruled that because of a lack of orientation he was unable to determine from the photograph that it did portray a fence with a drift to the east. Assuming without deciding that the failure to admit the photograph in evidence was error, it is clear from the record and the remarks of the trial court that the admission of the photograph would not have resulted in any change in the decision of the trial court. Hence, the error, if any, was harmless.

We hold that Pointners did not sustain their burden of proving that the location of the original quarter corner was in fact at the place for which they contended. The trial court's findings and conclusions were based on substantial, although conflicting, evidence, and therefore will not be disturbed on appeal. We have considered appellants' other assignments of error and find them to be without merit.

The judgment is affirmed. Costs to respondents. No attorney's fees on appeal.

DONALDSON, C.J., and BAKES, BISTLINE and HUNTLEY, JJ., concur.