901 P.2d 1333

**KOOTENAI ELECTRIC COOPERATIVE, INC., an Idaho corporation, Plaintiff–Respondent,**

v.

**The WASHINGTON WATER POWER COMPANY, a Washington corporation, Defendant–Appellant.**

No. 21328.

Supreme Court of Idaho, Coeur d'Alene, April 1995 Term.

Sept. 1, 1995.

Paine, Hamblen, Coffin, Brooke & Miller, Coeur d'Alene, for appellant. Patrick E. Miller, argued.

Stephen M. Ayers, Coeur d'Alene, for respondent.

SILAK, Justice.

This action involves a dispute between two electric suppliers as to which may legally serve individual consumers within a light industrial park. The appellant, the Washington Water Power Company (WWP), seeks reversal of the district court's decision that its "feeder tie" should not be considered an "existing service line" to establish a measuring point for determining entitlement to serve new consumers under the Idaho Electric Supplier Stabilization Act, I.C. § 61–332, *et. seq.* We affirm.

## I.

## FACTS AND PROCEDURAL BACKGROUND

The Coeur d'Alene Commerce Park (the Park) is a commercial subdivision located on Kathleen Avenue between Highway 95 and Ramsey Road in Coeur d'Alene, Idaho. The property is owned by David and Susan Schreiber and was being developed by Triad Development, Inc. (Triad), an Idaho corporation of whom the Schreibers, Patrick Acuff, Dean Haagenson and Robert Wheeler were shareholders. Triad was formed to develop the Park which is zoned for light industry. It is expected that when fully developed, businesses at the Park will collectively demand upwards of 72,000 kilowatt hours of electricity per year.

Before the development of the Park, the land was bare ground on which no electric consumer was located. There were electric distribution lines or "service lines" (less than 69 kv) in the vicinity of the area which were

subsequently extended into the Park. All of the service lines closest to the Park were owned by Respondent Kootenai Electric Co-operative, Inc. (KEC), and were within 1,320 feet of all parts of the Park.

Triad contacted both WWP and KEC regarding providing service to the Park in the spring of 1991. During Triad's negotiations with KEC, representatives stated that WWP could not serve the Park without a written waiver from KEC. After reviewing the development plan, KEC presented a proposal to Triad whereby Triad would pay approximately $38,000 to reimburse KEC its cost in extending its electric facilities to the development and running an electric "backbone" system throughout the Park. The proposal also provided that within five years, as consumers located within the Park, KEC would rebate a proportionate amount of the cost to Triad.

With respect to Triad's negotiations with WWP, WWP at first did not actively solicit Triad's business and advised Triad that KEC's service lines were closer to the Park than WWP's. Later, WWP advised Triad that if WWP provided service to the Park, and ran underground lines throughout the Park, there would be no charge to Triad. During this period, WWP did have two main power distribution lines, known as feeder lines, in the vicinity of the Park, but not located where they could compete for consumers of the Park. One feeder line, 112, primarily served a residential area known as Fairway Forest Subdivisions. The second line, 113, primarily served a commercial load. In 1991, WWP's engineering department was planning to install a service line known as a "feeder tie" in the Fairway Forest Subdivision area due to expected residential and commercial growth. A feeder tie is a power line which connects feeder lines. The feeder ties allow utilities to transfer electrical loads between feeder lines to prevent single feeder lines, and their substation supply points, from being overtaxed.

In March 1992, KEC sent a contract to Mr. Haagenson which set forth the terms by which KEC would install its facilities to and throughout the Park. Before it was signed, and apparently without Mr. Haagenson's knowledge, Patrick Acuff, on behalf of Triad, signed a contract with WWP. Shortly afterwards, WWP constructed an underground three-phase line to and through the Park in late March and early April 1992.

On April 28, 1992, KEC filed a complaint in district court against WWP seeking declaratory relief that under the Idaho Electric Supplier Stabilization Act (IESSA or Act), I.C. § 61–332, *et seq.*, WWP is not entitled to provide any electric service within the Park. KEC alleged that WWP's "feeder tie" line, which runs through the Park, was installed in violation of the Act and therefore cannot be considered an "existing service line" for purposes of determining entitlement to serve new consumers. WWP answered stating that the "feeder tie" line was not installed in violation of the Act, and that WWP was also entitled to provide service to companies and businesses that build facilities in the Park.

After a bench trial in March 1994, the district court issued its Memorandum Opinion in favor of KEC, holding that WWP's feeder tie is not an "existing service line" under the Act, and that the feeder tie could thus not be used as a measuring point to determine whether WWP may supply electric service within the Park. WWP appeals.

## II.

### ISSUES ON APPEAL

1. Whether the trial court erred in concluding that the feeder tie was constructed to obtain an advantage under the IESSA.

2. Whether the trial court erred in concluding that the construction of the feeder tie was not for the purpose of supplying service to WWP consumers.

3. Whether the trial court erred in concluding that WWP's feeder tie cannot be used as a measuring point to determine which supplier may supply electric service to consumers within the Park.

### III.

### ANALYSIS

#### A. STANDARD OF REVIEW

 The standard of appellate review of a trial court's findings of fact is well settled. Findings which are supported by substantial and competent, although conflicting, evidence will not be set aside on appeal. *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 256, 846 P.2d 904, 907 (1993). The trial court's

findings of fact will be liberally construed in favor of the judgment entered, and will not be set aside unless clearly erroneous. *Abbott v. Nampa Sch. Dist. No. 131,* 119 Idaho 544, 547, 808 P.2d 1289, 1292 (1991). When the trial judge is the trier of fact, it is his or her province to weigh the conflicting evidence and testimony and to judge the credibility of witnesses. I.R.C.P. 52(a); *Abbott v. Nampa Sch. Dist. No. 131,* 119 Idaho at 547, 808 P.2d at 1292; *Pointner v. Johnson,* 107 Idaho 1014, 1018, 695 P.2d 399, 403 (1985).

█ The standard of appellate review of a trial court's conclusions of law is also well established. The reviewing court is not bound by the legal conclusions of the district court and is free to draw its own conclusions from the facts presented. *Corporation of Presiding Bishop v. Ada County,* 123 Idaho 410, 415, 849 P.2d 83, 88 (1993); *Clark v. St. Paul Property & Liab. Ins. Co.,* 102 Idaho 756, 757, 639 P.2d 454, 455 (1981).

## B. STATUTORY CONSTRUCTION

█ In applying IESSA, as with all statutes, if the statutory language is clear and unambiguous, the Court need merely apply the statute without engaging in any statutory construction. *Ada County Assessor v. Roman Catholic Diocese,* 123 Idaho 425, 428, 849 P.2d 98, 101 (1993); *Ottesen v. Board of Comm'rs. of Madison County,* 107 Idaho 1099, 1100, 695 P.2d 1238, 1239 (1985). However, if it is necessary for the Court to construe the statute, then the Court will attempt to ascertain legislative intent. *Sweitzer v. Dean,* 118 Idaho 568, 571, 798 P.2d 27, 30 (1990). In construing a statute, this Court may examine the language used, the reasonableness of the proposed interpretations, and the policy behind the statute. *Id.* at 571–72, 798 P.2d at 30–31.

## C. THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT WWP'S FEEDER TIE WAS CONSTRUCTED TO OBTAIN AN ADVANTAGE UNDER THE IESSA EVEN THOUGH IT ALSO FOUND THAT THE FEEDER TIE WAS CONSTRUCTED FOR OTHER LEGITIMATE PURPOSES.

█ The purpose of the IESSA is expressed in I.C. § 61–332(B):

This act is designed to promote harmony among and between electric suppliers furnishing electricity within the state of Idaho, prohibit the "pirating" of customers of another supplier, discourage duplication of electric facilities, and stabilize the territories and customers served with electricity by such suppliers.

The term "pirating," as used under the IESSA, means providing electrical service to a customer who is receiving electricity from another electrical supplier or who had previously received electricity from that supplier. *See* S.L.1957, Ch. 133, § 1, p. 226; *see also* I.C. § 61–332B.

IESSA implements its purpose by establishing a set of rules for selecting which supplier, among competing electric suppliers, has the right to supply new consumers. These rules are provided in I.C. § 61–332C:

**Rules for Selecting Electric Supplier for New Electrical Service Entrances**—In the event more than one electric supplier is willing and able to provide adequate electric service to a consumer at any new electric service entrance, the following rules shall govern:

1. If no electric supplier has an *existing service line* within 1,320 feet of the new service entrance the consumer shall have the right of choice of supplier.

2. If only one electrical supplier has an *existing service line* within 1,320 feet of the new service entrance that supplier shall have the right to serve the consumer at the new service entrance.

3. If more than one electrical supplier has an *existing service line* within 1,320 feet of the new service entrance the supplier whose existing service line is nearest the new service entrance shall have the right to serve the consumer at the new service entrance.

4. If more than one electric supplier has an *existing service line* within 1,320 feet of the new service entrance and the existing service lines are equidistant from the service entrance, or it cannot be determined

by proof which service line is nearest the new service entrance, then the consumer shall have the right of choice of supplier.

No electric supplier shall construct or extend facilities, nor make any electric connections, nor permit any connections to be made from any of its facilities to any new service entrance nor shall it supply electric service to any new service entrance in violation of the rules herein, without the written consent of any electrical supplier with a prior right under the rules to serve the consumer at the new service locations.

(Emphasis added). The issue of which electric supplier is entitled to serve a new consumer is usually determined by which electric supplier has the closest "existing service line" to the consumer's new service entrance. The IESSA defines an "existing service line" as:

Any electric service line in existence at the time of the event in question and constructed to supply a consumer that could be lawfully served by that supplier under this Act. It shall not mean any service line constructed to obtain an advantage under this Act, or to evade its purpose or terms.

I.C. § 61–332A(11).

Thus, the main issue in this case is whether WWP's "feeder tie," which runs through the Park, is an "existing service line" which would allow WWP to compete for consumers with KEC pursuant to the electric supply rules established by I.C. § 61–332C. The district court found that WWP's feeder tie was not an "existing service line", and that KEC has sole and exclusive right to supply the consumers within the entire Park with electricity.

In its findings of fact, the district court found that the construction of the feeder tie was in accordance with prudent utility practices; that it was constructed for a valid engineering purpose; and that the route chosen (through the Park), was a reasonable one and was justified on an engineering basis. The court found that the engineering justifi-

cation for the construction of the feeder tie was to balance the loads between WWP feeder lines 112 and 113. However, the court also found that one of the purposes for the construction of the feeder tie was to create a competitive service line to provide electrical service to the occupants of the Park, and thus concluded that the feeder tie was constructed to obtain an advantage under the IESSA. WWP argues that this latter conclusion is inconsistent with the court's findings and that the order of the district court should be set aside.

■ We hold that there is substantial and competent evidence in the record to support the district court's findings and conclusions that WWP's feeder tie was constructed to obtain an advantage, and that therefore the feeder tie does not fall within the definition of "existing service line" pursuant to I.C. § 61–332A(11). Among the evidence presented at trial is the following: (1) the Park was designed by its developers to be a major commercial/industrial area consisting of 55 acres. Companies and industries which locate within the Park would use large amounts of electric energy, and would be desirable consumers to an electric supplier; (2) WWP made an offer to Triad to provide a line extension to the Park and the lines, transformers, and electric infrastructure within the Park for free, even though the cost of construction to WWP would be substantial; (3) though other routes were available to WWP for running a feeder tie line to provide load relief to the Fairway Forest Subdivisions, WWP ran its underground, three-phase line through the middle of the Park and installed modules above ground to serve as take-off points for the running of lines to serve consumers who would locate in the Park; (4) the engineer who designed and selected the routing of the WWP line admitted that providing service to the consumers who would locate in the Park was a factor in determining the routing of the WWP line, and one of the purposes for the building of the feeder tie; and (5) WWP's stated reason for constructing the feeder tie was to relieve the load demand in Fairway Forest, a residential subdivision. However, the record in-

dicates that residential subdivisions are adequately served with single phase power, whereas industrial consumers require three-phase power for their electric needs. WWP installed a three-phase line as its feeder tie through the Park, but installed only a single-phase line from the westerly boundary into the Fairway Forest Subdivisions.

Despite the evidence showing that WWP's reason for constructing the feeder tie line was to gain consumers in the Park, WWP focuses on the need for the line, and the reasonableness of the route of the line, to provide load relief in the Fairway Forest Subdivisions. WWP argues that if a feeder tie has engineering validity, then it cannot be a line "constructed to obtain an advantage." There is no dispute that feeder tie lines can be used for valid, non-competitive purposes by an electric utility. For example, a tie line providing an alternate or "loop" feed to an area already served by an electric utility can improve service reliability.

■ However, the fact that the court found the feeder tie line was built in accord with various engineering and prudent utility practices does not mean that a court is precluded from considering the electric supplier's motives for building it. Otherwise, if an electric supplier seeks to gain service territory all it need do is construct a feeder tie through the territory, and then prove that the line has an engineering purpose. Such an approach does not further the purpose of the legislature as set forth in I.C. § 61–332(B). Thus, we hold that even though WWP did show that it had legitimate reasons for installing the feeder tie through the Park, one of its significant purposes was to obtain an advantage over KEC, and thus the feeder line cannot be considered an existing service line in order to determine which supplier's lines are nearest to the new service entrance to the Park for selecting which supplier has the right to supply the new consumers.

### D. THE DISTRICT COURT ERRED IN FINDING AND CONCLUDING THAT THE CONSTRUCTION OF THE FEEDER TIE WAS NOT FOR THE PURPOSE OF SUPPLYING SERVICE TO WWP CONSUMERS.

■ WWP argues that the district court erred in finding that the construction of the feeder tie was not for the purpose of supplying service to WWP consumers, because the record indicates that the subject feeder tie was constructed and has been used to transfer electrical loads between feeder lines 112 and 113 during peak demand periods in the Fairway Forest Subdivisions, and that such load transferring was necessary to ensure continuous and reliable service to the subdivisions.

The specific finding in this case to which WWP objects, Finding of Fact 31, states as follows: "The construction of the feeder tie was not for the purpose of supplying electrical service to a consumer that could lawfully be served by WWP." WWP argues that this determination was based on the trial court's analysis that for a "service line" to be an "existing service line", it must be extended to provide new service, not better and more reliable service to existing consumers. In its oral decision at the conclusion of the trial, the district court explained its ruling:

And the Washington Water Power tie— and the testimony was at some length— was designed to balance load ... I find that balancing of load is a valid engineering purpose. I find the route selected in this matter to be a valid engineering choice to be made for a tie line. But I don't find that just because it ties and thereby consumers who are already being supplied both by 113 and consumers being supplied by 112 now transfer their energy back and forth. That's not a line that was constructed to supply a consumer. Those consumers are already being supplied. This is a line that was created to balance a load ... If a new substation is constructed and somebody runs a line from that substation over to provide some relief or to tie the system together—they may run it several miles across the prairie theoretically to do that—I don't think that is an existing service line for measurement purposes. It may be engineering valid. It may have a whole lot of other purposes, but I don't think it becomes an existing service line just because you're tying ends of your system together.

Now, if you have to run it over there to provide service to a consumer, *new service,* then I think it may well become one and be service along that line.

(Emphasis added). WWP argues that the district court's analysis and determination that a "service line" must be "constructed to supply a [new] consumer" strays from the letter of the IESSA, and I.C. § 61–332A(11) in particular.

I.C. § 61–332A(6) defines "consumer" as:

Any person, firm, corporation or other entity *receiving or intending to receive* electrical service at a specific service entrance.

(Emphasis added.) Nowhere does this definition require that a consumer be "new". In fact, under I.C. § 61–332A(6), a "consumer" is considered a person already "receiving" electric service, *i.e.,* an existing consumer. Thus, because the definition of "consumer" includes people or entities who are both already on the line or who intend to obtain service, we hold that the district court's finding of fact 31 is not supported by substantial and competent evidence since at least one of the reasons for constructing the feeder tie was to supply electrical service to existing consumers on lines 112 and 113 who were certainly lawfully served by WWP.

Although the Court rules in favor of WWP on this issue, we find this error to be harmless since we held above that one of the purposes behind WWP's constructing of the feeder tie was to obtain an advantage, and therefore that line cannot be considered an existing service line for use as a measuring point.

**E. THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT WWP'S FEEDER TIE CANNOT BE USED AS A MEASURING POINT TO DETERMINE WHICH SUPPLIER MAY SUPPLY ELECTRIC SERVICE TO CONSUMERS WITHIN THE PARK.**

WWP argues that KEC admitted that the feeder tie would be a valid measuring point

for determining the right to serve if it had been located outside the boundary of the Park. There is no evidence in the record that KEC made any admissions as to this aspect of this case. Further, we hold that the district court did not err in concluding that WWP's feeder tie cannot be used as a measuring point. Because we held above that one of WWP's purposes in constructing the feeder tie lines was to obtain an advantage over KEC, and that the lines therefore did not meet the requirements of an "existing service line" under I.C. § 61–332A(11), by definition the feeder tie cannot be used as a measuring point for determining which entity has the right to provide electric service to the Park. *See* I.C. § 61–332C(3).

## IV.

### CONCLUSION

We affirm the district court's finding and conclusion that even though WWP had legitimate reasons for constructing its feeder tie, one of its significant purposes was to obtain an advantage over KEC; therefore, the feeder tie does not meet the definition of "existing service line" under I.C. § 61–332A(11) and cannot be used as a measuring point pursuant to I.C. § 61–332C(3). We further hold that the district court erred in finding that the construction of the feeder tie was not for the purpose of supplying service to WWP consumers. One of WWP's reasons for constructing the feeder tie was to balance the loads of the lines already serving WWP's existing consumers in the Fairway Forest Subdivisions. I.C. § 61–332A(6) defines "consumer" as a person or entity already receiving, or is intending to receive, electric service at a certain service entrance. Thus, there is no requirement under I.C. § 61–332A(11) that the consumer be a new customer. We find the court's error here to be harmless.

We further hold that the district court did not err in concluding that WWP's feeder tie cannot be used as a measuring point to determine which supplier may supply electric

service to the consumers in the Park. Because we hold that one of WWP's purposes in constructing the feeder tie was to obtain an advantage over KEC, and therefore does not meet the requirements of "existing service line", by definition the feeder tie cannot be used as a measuring point.

Accordingly, the decision and order of the district court are affirmed.

Costs to respondents. No attorney fees on appeal.

McDEVITT, C.J., JOHNSON, TROUT and SCHROEDER, JJ., concur.